DULUTH-SUPERIOR MILLING COMPANY, Respondent, vs. NORTHERN PACIFIC RAILWAY COMPANY, Appellant.

*January 30—March 11, 1913.*

*Interstate commerce: What service is part of interstate transit: Switching to point of unloading on another railroad: Regulation of charges: Jurisdiction of state railroad commission.*

1. The state railroad commission does not have jurisdiction to regulate service charges in the conduct of interstate commerce.
2. If the state railroad commission erroneously assumes jurisdiction to pass upon the reasonableness of compensation demanded by a railroad company for elements of service rendered wholly within a state, but forming part of an entire interstate transit, its decision is void for want of power to deal with such matters.
3. In determining whether an element of service in the transportation of freight from a point in one state to an unloading point in another, is within the field of interstate commerce, the circumstances of a through tariff rate, a through bill of lading, or absence of it, and continuity of ownership and consignee from the time of delivery at the origin of the freight to the point of unloading, are evidentiary but not controlling.
4. Between the point of delivery of freight for transportation and the point for discharge thereof, there may be changes of ownership, changes of consignee, successive bills of lading, or no bill of lading at all for some section of the transit, and the subject of the carriage be, yet, that of interstate commerce from beginning to end.
5. In case a car of freight is started for a point without to a point within the state and the transit is characterized by a bill of

Duluth-Superior M. Co. v. Northern Pacific R. Co. 152 Wis. 528.

lading which does not expressly call for delivery at an unload-
ing point, but the general custom is to place such cars at a
terminus within the scope of the expressed delivery point,—to
be removed therefrom to an unloading point, determined after
arrival thereat, or at the start, or in the meantime,—either by
the initial or some connecting carrier, there being no expecta-
tion from the start, of the freight being discharged at the point
of temporary break in the transit, nor facilities therefor,—the
presumption is that the shipper purposed, in the beginning,
that the freight should go beyond such terminus to a place for
unloading, and the whole is a unit as regards whether the
service is inter- or intrastate, regardless of the fact that such
terminus answers the literal call in the bill for the end of the
shipment and in fact as to the particular tariff rate specified
therein.

6. In the case suggested in the foregoing, the temporary place of
stoppage, though satisfying the literal call of the bill of lading,
is to be regarded only as marking the end of part of the entire
transit covered by the tariff rate mentioned in such bill, where
continuance to the unloading point is required to be over an-
other line,—the additional movement does not militate against
the subject of the shipment being interstate to such unloading
point.

7. When property is delivered to a carrier in one state for the pur-
pose of having the same transported to an unloading point in
another state, it is matter of interstate commerce until it is
unloaded at the terminus of the service sought or tendered for
unloading, regardless of the number of elements making up the
entirety of the transit and that the last is a mere switching
movement not covered by a bill of lading.

8. In general, it is the character of the service required, intended,
and rendered, not the manner in which it is accomplished,
which determines interstate character. Such service impresses
the subject of the transit at the start, and delivery at the un-
loading point where the person entitled to receive the freight
has reasonable opportunity to accept discharge of it, removes
such impress.

[Syllabus by MARSHALL, J.]

WINSLOW, C. J., concurs in the result.

VINJE, KERWIN, and BARNES, JJ., dissent.

APPEAL from a judgment of the superior court of Douglas
county: CHARLES SMITH, Judge. *Reversed.*

Action to recover $735, claimed to have been illegally de-

manded for switching charges and paid by plaintiff to the Minneapolis, St. Paul & Sault Ste. Marie Railway Company for use of defendant.   Plaintiff, by appropriate allegations, pleaded that the defendant switched 490 cars of grain from the initial carrier's terminal yard in Superior, Wisconsin, to plaintiff's mill therein; that the service was rendered by defendant at such company's request, and that it claimed and received $3 per car therefor which was charged by such carrier to plaintiff; that in due course before the railroad commission of Wisconsin the amount received for such service was held exorbitant to the extent of $1.50 per car, or $735 in the whole, which defendant was ordered to refund.

Defendant answered, claiming the switching to have been done for the Minneapolis, St. Paul & Sault Ste. Marie Railway Company in execution of transit service in the carriage of carload lots of grain from points outside this state to the unloading place in Superior, Wisconsin; that defendant, as an interstate carrier, complied with all the regulations in respect to such business and was thereby entitled to charge and collect $3 for each of the cars switched by it, and that the railroad commission of Wisconsin had no jurisdiction in respect to the matter.

The trial court found: Defendant did the switching as alleged and charged and collected therefor $3 per car.   The Wisconsin railroad commission, in a hearing under ch. 136, Laws of 1909, ordered $735, as and for money paid for the switching in excess of reasonable compensation therefor, to be refunded.   The compensation exacted by defendant and received was, in fact, exorbitant as so held.

The evidence upon which such findings were made was to this effect: The Minneapolis, St. Paul & Sault Ste. Marie Railway Company, the defendant, and other railway companies have terminal yards in Superior and are engaged in interstate traffic.   In the proper terminal yard of each line cars therefrom are placed as brought in from points outside

the state and are, later, by it or some connecting company, placed at the appropriate unloading point in Duluth or Superior. Each car lot of grain from a Western point is necessarily so handled, there being no facilities for unloading the same in the yard. The customary way, and one followed in respect to each of the cars in question, is for the shipper of a car of grain at the point of origin of the freight, to consign the same to some person, firm, or corporation doing a brokerage business on the board of trade at Duluth. The initial carrier transports the car to its terminal yard in Superior to await the final disposition thereof upon order of the shipper through his broker. The uniform understanding between shipper and carrier is that the car will be left in the latter's terminal yard subject to order from the former's agent, through a clearing office, characterized as a sampling bureau, for delivery to some elevator or mill, as desired by the buyer, for unloading. If the track of the initial carrier reaches the unloading point, the delivery thereat is, in general, made without charge. If it is not so reached, then the initial carrier engages the railway company having a connecting line which does so reach, and pays the switching charges thereto. The switching company does not know the buyer of the grain in the transaction. It takes its orders wholly from the initial carrier and demands and obtains its compensation therefrom, and such carrier handles the matter as an entirety, collecting the freight charge and the switching expense as well, of the party finally receiving the grain, though, ordinarily, separate bills are rendered, and sometimes absorbing such expense where the freight originates at a competing point and such absorption is necessary to put the two carriers on an even plane.

Switching accounts between two companies are settled, either by offset of the smaller bill against the larger one and payment of the balance, or by each company auditing and paying the bill rendered by the other. In case of each of the

cars in question, the destination expressed in the bill of lading was Superior, Wisconsin, but it was, by universal custom, understood to mean such unloading point there or Duluth as might be, in due course, designated; an expense bill covering the switching charges being an incident of the transit in case of the unloading point being off the initial carrier's line.   The contract was, customarily, treated as binding the initial carrier to transport the car to such usual place of unloading at such destination, as might be, in due course, selected, and, as indicated, without extra charge, if on its road, otherwise to transfer the car to some connecting carrier to continue the transit to the desired unloading place.    The terminal yard in question was on the route to the final destination in every case of a car of grain coming to Superior, Wisconsin, from a point outside this state by way of the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, whether the unloading point was reached by its system or, necessarily, by a connecting line.

Judgment was rendered in favor of the plaintiff.

For the appellant there was a brief by *Hanitch & Hartley,* attorneys, and *C. W. Bunn* and *Emerson Hadley,* of counsel, and oral argument by *Louis Hanitch.*

*W. R. Foley,* for the respondent.

MARSHALL, J.   Was the service in question of interstate character ?   If so, it is conceded that the Wisconsin railroad commission had no jurisdiction to regulate the charges therefor and the judgment based thereon must be reversed.

Respondent's claim is, that because the bill of lading, in each case, was for a transit to Superior, and the terminal yard of the Minneapolis, St. Paul & Sault Ste. Marie Railway Company was there, and as near the finally determined upon unloading point as could be reached by its line, and there was no through bill of lading to such point, that the switching service was rendered as an independent matter. That, at first impression, seemed plausible.

True, when a car reached the terminal yard it had arrived at Superior. If we look only to the literal meaning of words and close our eyes to the service the shipper contemplated, to the knowledge of the carrier, we could readily conclude that the interstate service was completed before the switching service was rendered and therefore such service was intrastate. But the obligation of the initial carrier must be viewed from the standpoint of the parties when it was incurred, and the real relation thereof to the service required to execute the shipper's purpose must be kept in view. The obvious facts that, at the place of origin of the freight, both parties to the transaction of commencing the transit contemplated a termination where the grain could be discharged in the usual manner; that there were no facilities therefor at the terminal yards and that the universal custom was to move cars, after having been placed in the yard, to some mill or elevator at the head of the lake designated, in due course, by the shipper through his agent, either on the initial carrier's or some other road connecting therewith, show that the bill of lading given in each case, does not, in its letter, express the whole agreement. The word "Superior" was not used to mean, merely, inside the corporate limits thereof or the initial carrier's yard there. The ordinary rule applies that where, following the literal sense of a contract, the result would be so unreasonable or absurd that no one would be fairly considered to have so intended, and if, without so bending the words used out of their ordinary sense as to violate the rules of language or of law, they can be seen to embody a sensible agreement, and the circumstances characterizing the transaction support that view, such should be taken as the real understanding between the parties. That course does not change a contract,—vary it in any way; it merely gets out of it the sense the parties intended to put into it.

Without spending time to discuss the matter at length, it is considered, very plain, that though "Superior" was stated as the destination in case of each car, the real meaning was

the subsequently selected place for unloading at Superior; the terminal yard being regarded as a temporary stopping place on the route to such place and the point covered by the tariff rate to Superior, in case of completion of the transit to such place being necessarily over a connecting line. It was no more the contemplated termination of the interstate commerce service when the car was required to be delivered to a connecting line in order to reach the unloading point, than when it could be transported to such point on the line of the initial carrier. The contract, in any event, was made in view of the necessity which might arise for use of a connecting line. It provided for delivery to such a line, in the route to the final destination. No other term than "Superior" exactly fitted the situation, at the origin of the service, because the particular destination was determinable only by the shipper's agent later. As soon as that was known, in due course in each case, the car was moved thereto by the initial carrier, or a connecting road employed by it at the expense of the shipper, according to the necessities of the case, and thereby the service contemplated at the start brought to a finish.

Every circumstance in respect to the matter under consideration bears out the view expressed. Not only must it have been contemplated that the interstate commerce character of the grain loaded upon the cars of the initial carrier would continue to the unloading point, but the freight was handled under orders of the shipper's agent to the end, possession however remaining with the initial carrier or its selected connecting line,—the final service being rendered upon its request and receipt of information as to the destination.

So it seems clear that the service contemplated when the freight was received gave thereto its impress as a subject of interstate commerce; that such impress was not removed until the service was completed by the last movement which ended at the unloading point. The intention of a shipper, known

to the carrier when the transit commences, as to the service required to complete the former's purpose, and perhaps whether so known or not,—not the mere tariff rate mentioned in the first bill of lading, or the mere destination mentioned in connection with such tariff rate, or whether there is a through bill of lading or a bill of lading at all covering every element of the transit,—governs the character of the commerce. The named destination in the initial bill may be a mere place in the route to the final destination to be reached by the entire service, part to be performed by the initial carrier and part by connecting carriers; the charges for services of the latter to follow the initial bill as an expense matter in accomplishing the entire service or be liquidated in some other manner.

It is difficult to see how any other course of reasoning or any other result, under the circumstances, could well be reached than the foregoing, even if the question at issue were to be viewed from an original standpoint. If a car of freight, originating at St. Paul, Minnesota, were to be started for New York destined for some point abroad, the land transit being by an initial and successive carriers, all for a through rate, but subject to a custom at New York for trunk lines to turn incoming freight over to a concern doing switching service for delivery at the particular steamship dock designated by the shipper after commencement of the transit; the charge therefor to follow the bill as a special expense matter,—no one would question but that the entire service would be of interstate character. Why so? Not because of a through-rate contract for service, obviously, which might be rendered by a service charge over the initial line to its terminus, with authority to turn the car over to a connecting line for transportation to the terminus thereof, with authority continuing to deliver for further transportation and, finally, for delivery to a switching company in New York for placement at the unloading point, the charge for each section of the transit

after the first to be evidenced by a bill of lading issued by each particular line, following the initial bill, and all including the switching expense to be discharged in the hands of the last carrier or in some other way. There might be several contracts all making up one entire service or be one, to effect the object of transporting the car to the dock in New York, and the particular dock not be determined upon until after the arrival in the last terminal yard of the final trunk line. It cannot be that the mere method of accomplishing the object in view when freight is delivered to an initial carrier,— whether by a through-routing contract, the transit to be by way of an initial and successive lines, including a terminal switching company service, or by successive connecting contracts, each in order from the first being authorized to make the one succeeding,—determines the character of the commerce as to whether inter- or intrastate as regards the last movement required to reach the unloading point. The character of the initial contract is, doubtless, evidentiary of the purpose of a shipper; but it does not control to make a subject of interstate intrastate commerce. The purpose, in starting the freight, if pursued to the end, not the particular method of executing it, controls. In other words, the service sought at the start, all of it, the initial and the successive elements connected to form the whole, settles the matter.

Counsel for respondent relies, largely, on what is found in *Gulf, C. & S. F. R. Co. v. Texas,* 204 U. S. 403, 27 Sup. Ct. 360. The railroad commission and trial court, doubtless, were likewise influenced, as it seems, without fully appreciating the reasoning of the court in connection with the facts with which it had to deal. There was not the circumstance of a transit, commenced, as in this case, with intention of having the service continue to an unloading point requiring the particular element called in question. After a movement from a point in one state to a point in another, contemplated at the start, an attempt was made to tack on to the completed inter-

state service an independent transportation to another distant point in the same state. There was no obligation of the carrier entered into at the time of the origin of the freight, for delivery to a connecting carrier for transportation to an unloading point, as in this case. The delivery which was finally made was to a second carrier—made as a mere forwarder to such carrier, to perform a new contract and not in furtherance of a transit initiated at the start. Here the last delivery to a carrier was made under the initial contract and as part of the service contemplated at the start for transportation of the grain from the place of origin of the freight to the place for discharging it.

As we understand the logic of the *Gulf Case,* if the service, commenced by the initial carrier, had contemplated continuance, by means of a connecting line, to the end of the transit which was called in question, neither changes of title to the subject of transportation in the meantime, or separate bills of lading for the separate sections of the transit making up the continuous service, nor absence of a bill of lading for any particular section, would have made any difference with the question of whether the whole was or was not interstate commerce. There was a finding made by the trial court that the service initiated was the transportation of the freight from Hudson, South Dakota, to Texarkana, Texas, and that after the service had been fully completed the freight was started under an entirely new contract in execution of a new purpose from Texarkana, Texas, to Goldthwaite, Texas. The court, on the appeal, treated that finding as conclusive and, naturally, reasoned therefrom that the last shipper who had bought the property during the interstate movement, might have unloaded it at Texarkana and shipped other property of the same kind on to Goldthwaite to fill the order from there; that a continuous service in fact, commencing at Hudson, South Dakota, and ending at Goldthwaite was not contemplated when the transit commenced; that the primary idea

was of transportation to Texarkana for unloading there and identification of the property with chattels in general within the state of Texas.    It is to be particularly noted that, in the Goldthwaite case, the service initiated was for a movement of property from Hudson, South Dakota, to a particular consignee at Texarkana; that the initial carrier issued its bill of lading, stipulating for a carrier's rate to Kansas City, the property to be there turned over to a connecting carrier; that the latter issued its independent bill of lading for delivery to a new consignee at Texarkana, and that it was the attempt of the latter consignee to tack on his entirely new desired transportation, having no connection whatever with the initiated service, which led to the trouble.    That the facts do not fall within the principle applicable to the quite different circumstances we have in this case, seems plain.

Counsel and the trial court seem to have been misled by the idea that the syllabus in the Goldthwaite case—to the effect that an interstate shipment on reaching the point specified in the original contract of transportation, ceases to be an interstate shipment as regards a further movement in the same state—embodies the legal principle illustrated by the opinion and decision.    Not so.    The opinion shows, quite clearly, that the case did not turn on the mere fact that the shipment had reached the point specified in the original bill of lading before the movement called in question was entered upon; but because the service initiated, as matter of fact, was from Hudson, South Dakota, to Texarkana, Texas, and, necessarily, to some delivery point therein where the freight, in due course, could be discharged.    True, the language of the opinion has led on many occasions to attempts to apply it, as in this case, but without success, the court in each instance being required to point out that the nature of the service, not the contract mentioned in any particular bill of lading, is the controlling circumstance.

The foregoing analysis of *Gulf, C. & S. F. R. Co. v. Texas,*

to the effect that it is the service contemplated at the commencement of a transit which impresses the subject of the commerce with interstate character, not the particular contract expressed in the initial bill of lading, is made very plain in subsequent cases decided by the federal supreme court, as the following will show:

In *Southern Pac. T. Co. v. Interstate Comm. Comm.* 219 U. S. 498, 31 Sup. Ct. 239, it was held that goods destined for export and, necessarily, when started in transit to be delivered at the dock at a seaport for further transportation, are the subject of interstate commerce all the way from the initial point to the unloading dock, whether shipped on through bills of lading or on one bill to a terminal within the states to be then delivered to a carrier for the foreign destination. In the particular case, there was an initial bill of lading, as here, which called for a shipment to the point of connection with the terminal tracks. Various railroads delivered cars, either directly or by switching service rendered by other roads, to the tracks of the terminal company, to be distributed by it, subject to its charges for trackage, to unloading points on the docks. The terminal company tracks furnished a connecting link between the terminals of the various systems of railroads and the unloading points on the docks. No bills of lading were issued for the transit over these tracks, or for switching service thereto from the roads which did not directly connect therewith. The bills of lading, in general, from points without the state of Texas as to property destined to pass over the terminal tracks in order to reach the dock, showed the places of origin of the freight and the destination to be Galveston. The initial lines, the switching company lines, and the terminal tracks were all held to be links in the transaction of interstate commerce business as to products intended for transit, which in the whole was of interstate character, and that when the property was delivered to the initial carrier it was said to have been delivered for the entire pur-

pose though the bill of lading did not in terms cover it. "It makes no difference," said the court, "that the shipments of the products were not made on through bills of lading." They were all destined for export and by the delivery to the Galveston, Harrisburg & San Antonio Railway they must be considered as having been delivered to a carrier for transportation to the foreign destination, the terminal company being a part of the railway for the purpose. Thus the real substance of the transaction, not the initial bill of lading, or whether it, in terms, called for a delivery over the terminal track or not, settled the question. The purpose of the transit could not be executed without the use of the connecting tracks. The same is true in this case. The purpose of the shipment of the 490 cars of grain from points without this state could not be executed without the switching movement from the terminal point of the Minneapolis, St. Paul & Sault Ste. Marie Railway Company over the tracks of the appellant to some unloading point,—an elevator for storage and loading on boats for further transportation, or a mill for change of the grain into manufactured products, or for further transportation without the state.

In the *Southern Pacific Terminal Case* it was held that the change at the docks of raw material into manufactured products for further transit was an incident of interstate commerce and did not mark the termination of the transit so long as the real purpose was to export the material forming the subject of the commerce at the start.

The doctrine of the foregoing, that it is the service contemplated and intention of the shipper, not the scope of the initial or that and successive bills of lading, or whether there is a bill of lading at all, that gives the subject of the transportation the impress of interstate commerce, and that the particular circumstances are evidentiary only and of more or less, or not any weight as regards the vital fact, is found indicated in many previous and subsequent cases, the more im-

portant of them being cited to our attention. *Railroad Commission v. Worthington,* 225 U. S. 101, 32 Sup. Ct. 653; *Coe v. Erroll,* 116 U. S. 517, 6 Sup. Ct. 475; *Union S. Y. Co. v. U. S.* 169 Fed. 404, 94 C. C. A. 626; *U. S. v. Union S. Y. & T. Co.* 226 U. S. 286, 33 Sup. Ct. 83; *McNeill v. Southern R. Co.* 202 U. S. 543, 26 Sup. Ct. 722; *West Texas F. Co. v. Tex. & Pac. R. Co.* 15 Interstate C. C. Rep. 443. To these many more might be added. They seem to leave little or no room for doubt but that the service sought at the place of origin of the freight in question when it was tendered and accepted, was a transit to an unloading point at the head of the lakes, and, regardless of contracts for specific portions of the transit, it did not lose its impress as a subject of interstate commerce till delivered into possession of respondent at its mill. Once out of possession of the shipper and in possession of the carrier as a subject of interstate commerce, always interstate commerce until delivered into possession of a purchaser as intended at the start. As said, in effect, in *West Texas F. Co. v. Tex. & Pac. R. Co.:* it was an interstate commerce shipment from the time it commenced as such, until it was delivered at the respondent's mill.

In the case last referred to the facts were quite identical with those here and the interstate commerce commission, following the logic of the federal decisions, easily distinguished it from *Gulf, C. & S. F. R. Co. v. Texas,* 204 U. S. 403, 27 Sup. Ct. 360, upon which the complainant there relied, as the complainant here does. The freight was delivered to the Santa Fe road at Gallup, New Mexico, consigned to the West Texas Fuel Co. at El Paso. The Santa Fe tariff was for a transit to its terminus at El Paso. It employed the Texas & Pacific Railway Company, which had a connecting line reaching the desired point for unloading, to switch the car thereto. The latter company, without direction from the party to finally receive the freight at the termination of the switching service, but as a servant of the Santa Fe Company, executed final

delivery service, making its charge therefor, which was liqui-
dated, as in this case.    The property did not pass into posses-
sion of the shipper or his vendee until after the switching
service was performed.

In *Union S. Y. Co. v. U. S.* 169 Fed. 404, 94 C. C. A. 626,
the original bill of lading was substantially the same as here,
and the switching service the same.    The purpose of the
transit from the outside state place was to reach an unload-
ing point at the stock yards, making use of the connecting
stock-yards track necessary.    The service over such tracks
was performed at the request of the primary carrier and with-
out any bill of lading.    The court remarked, in effect, con-
trolling decisions leave no room to doubt that the stock yards
company, in the operations of its tracks, is a common carrier
engaged in interstate commerce.

In *Railroad Commission v. Worthington,* 225 U. S. 101,
32 Sup. Ct. 653, *Gulf, C. & S. F. R. Co. v. Texas, supra,* was
specially relied upon, as here, to maintain that through bill-
ing to the unloading point is essential to preserve the inter-
state commerce character of the freight to such point when
reached by a switching service; but that was most emphatic-
ally rejected,—*Southern Pac. T. Co. v. Interstate Comm.
Comm.* 219 U. S. 498, 31 Sup. Ct. 239, being particularly
referred to as establishing the rule that service intended and
possession therefor by successive carriers to the unloading
point, control as to the character of the last stage of the serv-
ice as well as the first; that all the elements going to make
up the entirety have the same cast.

In *U. S. v. Union S. Y. & T. Co.* 226 U. S. 286, 33 Sup.
Ct. 83, we find the last expression of the federal supreme
court,—reiterating what had been often said theretofore, that
in such circumstances as we find here, the switching service is
but one element in an interstate transit from loading to un-
loading point; the subject being in possession of an initial and
successive carriers from the place of origin of the freight to

Duluth-Superior M. Co. v. Northern Pacific R. Co. 152 Wis. 528.

the discharge into the possession of the receiver at the end of the transit. There, as here, the bill of lading issued by the initial carrier did not cover the transit over the switching track and there was no bill therefor. The service was performed by the switching company for the trunk line company and they paid therefor, absorbing it. The court, in speaking generally of the character of the service rendered by the trunk line and terminal company, said, quoting from a previous case, the interstate commerce duty "begins with their delivery to the carrier to be loaded upon its cars, and ends only after the stock is unloaded and delivered or offered to be delivered to the consignee." The fact that the performance of the service is distributed among different corporations, makes no difference where the service to be performed is a part of the carrying of freight by railroad. Nor does it make any difference that the switching company does not issue any bill of lading. "It is the character of the service rendered, not the manner in which the goods are billed, which determines the interstate character of the service."

There seems to be no need of pursuing the discussion further. The underlying principle indicated by the judicial treatment of the vital question here, plainly condemns the holding that, as the 490 cars of grain were placed on the terminal tracks of the initial carrier, merely waiting direction as to where to place them by the switching service for unloading, they lost the impress of interstate shipments. That impress was removed when the cars were placed at respondent's mill and under its control for unloading and not until then. The trial court decided wrong, as did the state railroad commission on the ultimate question of fact, by misconceiving the principle of law applicable to the evidentiary circumstances. In such a situation the ordinary weight to be given a trial court's decision on an issue of fact does not apply. The difficulty was in following the supposed rule of *Gulf, C. & S. F. R. Co. v. Texas, supra,* that a through-billing feature or a

contract for carrying to a particular point, regardless of the purpose of the shipment or the necessity of a further transit to reach an unloading point, is the test of when an interstate shipment ends. The language of that case, as is evident by the many times it has been referred to without success, must be confined to the particular situation the court had to deal with.

*By the Court.*—The judgment appealed from is reversed, and the cause is remanded with directions to dismiss with costs.

The following opinions were filed March 20, 1913:

WINSLOW, C. J. (*concurring*). I agree with the conclusion reached in this case on the following grounds:

This was an interstate shipment of grain. Both the shipper and the receiving railroad company knew when the shipment was made that the journey of the car and its contents was to end, not in the freight yard at Superior, but at some industry to be named by the consignee, either on the sidetracks of the receiving railroad or of some other connecting railroad system in Superior. In either case the intended journey was not to be completed at the yard, but only suspended at that point until the consignee had determined the industry to which the grain was to go. When that fact was determined and the car transported to that industry, the interstate journey was completed, and not before.

VINJE, J. (*dissenting*). The facts in this case show that shipments of wheat in carload lots were made over the Soo line from points outside the state to Superior, in this state, consigned to a commission broker; that the cars were sent to the terminal yards of the railway company in Superior, where the wheat was sampled and sold; that if the wheat was bought by an industry located on the Soo line, the railway

carried it to such industry under its original contract of ship-
ment and without any additional charge.  If the wheat was
bought by an industry not located on the Soo line it transferred it under its original contract of shipment to the receiv-
ing track of the connecting carrier without extra charge.  In
this case the wheat was bought from the broker by plaintiff,
whose mill was located on the *Northern Pacific Railway,* and
was delivered by the Soo line to the *Northern Pacific* road
and by it switched to plaintiff's mill at the request of the lat-
ter through the sampling bureau, and it paid defendant the
switching charges in dispute.  The question is, Does such
switching constitute interstate transportation?  I reach the
conclusion that it does not, for these reasons: When the wheat
was shipped it was impossible to determine whether or not the
shipment would end on the line of the initial carrier, in this
case the Soo line.  That being so, there can be said to have.
been no intention to ship it further, for if a shipment may end
with the initial carrier it cannot when shipped be intended to
go further.  It is not claimed that the initial shipment ended
at the terminal yard of the Soo road, but it is clearly estab-
lished by the evidence that the original contract of shipment
called for delivery without extra charge to any industry on
the Soo line at Superior or to the receiving track of a connect-
ing carrier in that city, and that when so delivered the con-
tract was completely performed.  The shipment, therefore,
so far as the original shipper was concerned, would end either
at an industry upon the Soo line, or at the receiving track of
a connecting carrier.  Since it might end upon the track of
the initial carrier, the switching done by the defendant was
an independent carriage, all done in this state, and consti-
tuted intrastate transportation under the rule announced in
*Gulf, C. & S. F. R. Co. v. Texas,* 204 U. S. 403, 27 Sup. Ct.
360.  The decision in that case was grounded upon the fact
that the shipment might end at Texarkana under the original
contract; that since it might so end there, the second ship-

ment from Texarkana to Goldthwaite, wholly within the state of Texas, was an independent and intrastate shipment. That is precisely the situation under which the wheat in this case was shipped: the shipment might end with the initial carrier. The fact that it did not is of no more consequence here than it was in the case cited.

Referring to the case of *U. S. v. Union S. Y. & T. Co.* 226 U. S. 286, 33 Sup. Ct. 83, the court says that in it "we find the last expression of the federal supreme court, reiterating what had often been said theretofore, that in such circumstances as we find here the switching service is but one element in an interstate transit from loading to unloading point." If I could persuade myself that the circumstances in the *Stock Yards Case* and the case at bar were the same or similar, I should concur in the opinion of the court. But I am unable to reconcile these differences: In that case no freight destined for the stock yards could be delivered upon the track of the initial carrier or without using the stockyards tracks; in this case wheat may be delivered to industries upon the line of the initial carrier. In that case all switching charges were included in the original contract and absorbed by the initial carrier; in this case the switching charges are not included in the original contract and are not absorbed by the initial carrier. In that case the original consignee paid the whole charges; in this case he pays them to the receiving track of the connecting carrier, and the purchaser of the wheat at Superior pays switching charges from such receiving track. In that case only one contract with one carrier was made; in this case two separate contracts by two separate parties are made with two separate carriers. In that case the original bill of lading was surrendered by the consignee when the freight reached its final destination; in this case the original bill of lading is surrendered by the first consignee to the initial carrier when the wheat reaches the sample yards at Superior, or industry upon line of initial carrier. In that

case the contract of original shipment was not contemplated to, did not, and could not, terminate on track of initial carrier; in this case it may do so.    It was under this state of facts in the *Stock Yards Case* that the court held that the railways of the stock yards companies must be deemed to be engaged in interstate commerce and performing services as railroads, "when they take the freight delivered at the stock yards, load it upon cars and transport it for a substantial distance upon its journey in interstate commerce under a through rate and bill furnished by the trunk line carrier, or receive it while it is still in progress in interstate commerce upon a through rate which includes the terminal services rendered by the two companies and complete its delivery to the consignee."    The decision of the court in that case was based upon the grounds: (1) That it was impossible for the freight to reach its destination except by using the tracks of the stock yards companies; (2) that there was but one contract of shipment; (3) that there was a through rate; and (4) that the switching charges were included in this through rate and were absorbed by the trunk line or initial carriers.    None of those facts are present in the instant case.

It was said in *Gulf, C. & S. F. R. Co. v. Texas,* 204 U. S. 403, 412, 27 Sup. Ct. 360: "When the Hardin Company accepted the corn at Texarkana the transportation contracted for ended.    The carrier was under no obligations to carry it further," and that "Whatever obligations may rest upon the carrier at the terminus of its transportation to deliver to some further carrier, in obedience to the instructions of the owner, it is acting not as carrier, but simply as a forwarder." So here when the wheat was accepted by the consignee at Superior and it was delivered to a connecting carrier upon directions from the purchaser, the transportation contracted for by the original shipper ended, and a new and independent shipment wholly within the state began, which was domestic and not interstate in character.

In *Texas v. Sabine T. Co.* 227 U. S. 111, 33 Sup. Ct. 229, it was held that a shipment of lumber, under a local bill of lading, made by the seller from an interior point in Texas to the gulf port of Sabine, Texas, was foreign commerce, it being admitted that the purchaser intended it for export, and had chartered ships at Sabine ready to receive it and into which it was loaded upon its arrival, even though the seller had no knowledge of its final destination and though the particular foreign port to which it might go was not determined upon by the purchaser at the time of the initial shipment, where such shipment was not an isolated one but typical of many others, on the ground that the lumber when it started upon its initial shipment also began its final journey to a foreign port. It was sought to bring the case under the rule of *Gulf, C. & S. F. R. Co. v. Texas,* 204 U. S. 403, 27 Sup. Ct. 360, but the court distinguished it from that case on the ground, as I construe the decision, that in the latter, as in the instant, case there might be no further shipment than the initial one, while in the case of *Texas v. Sabine T. Co.* the shipment could not end upon the lines of the carriers under the initial contract.

I am authorized to state that Mr. Justice KERWIN and Mr. Justice BARNES concur in this opinion.