## ERIE R. CO. et al. v. UNITED STATES.

District Court, D. New Jersey.   December 26, 1928.

No. 3746.

Herbert A. Taylor, Marion B. Pierce, both of New York City, and George S. Hobart, of Newark, N. J., for petitioners.

Elmer B. Collins, Sp. Asst. Atty. Gen.

E. M. Reidy, of Washington, D. C., for Interstate Commerce Commission.

Before DAVIS, Circuit Judge, and RELLSTAB and BODINE, District Judges.

BODINE, District Judge.  This is an application for a temporary and permanent injunction restraining the enforcement of, and annulling and setting aside, a certain order of the Interstate Commerce Commission dated November 2, 1928, requiring the Erie Railroad Company and the Hoboken Manufacturers' Railroad Company to publish and maintain on or before January 10, 1929, a rate of 10 cents per 100 pounds from Hoboken, N. J., to Garfield, N. J., for the transportation of wood pulp, in carloads, which has at some time lately been imported into the United States from a foreign country.

The jurisdiction of this court to hear and determine is conceded.

The Hammersley Manufacturing Company, which instigated the proceeding before the Interstate Commerce Commission, is engaged in the manufacture of paper at Garfield, N. J.  It requires in its business wood pulp.  The wood pulp comes from abroad, principally from German ports.  Messrs. J.

Andersen & Co. and Ira L. Beebe & Co., both of New York, appear to be brokers for the foreign producers of wood pulp and also brokers through whom the American manufacturers of paper purchase the pulp as required.

When the Hammersley Manufacturing Company requires pulp it enters into a contract of purchase with J. Andersen & Co. or Ira L. Beebe & Co., which, so far as pertinent, states that Andersen & Co. or Beebe & Co. have sold to the Hammersley Manufacturing Company a given quantity of wood pulp, designated by its German name, delivery ex-dock New York (Harbor), shipments from abroad.  When the pulp arrives it is loaded upon the cars of the Erie Railroad Company at Hoboken.  It is a fact that German vessels generally dock on the New Jersey side of New York Harbor.  The railroad company issues bills of lading for shipments from Hoboken to Garfield.

The transaction between the Hammersley Manufacturing Company and the brokers resulting in the contract referred to originates either by the offer by the New York broker to sell or the offer by the Hammersley Manufacturing Company to buy.  The New York brokers cable the German producers the terms of the offer and the names of the customers, and the New York broker, before entering into the contract with the American manufacturer, receives a reply cable of confirmation before executing the contracts.  The foreign bills of lading are addressed to the New York brokers, who pay for the pulp when it is on the ship in the foreign port.  Pulp which is to be distributed to several manufacturers in the United States is shipped in bulk under one bill of lading to the New York brokers, who distribute it in accordance with the terms of the contracts which they have previously made.

Everything which is done with the pulp after its arrival in the United States is controlled by the New York broker.  He has paid for the pulp at the foreign port.  It is his pulp.  He can assign it in accordance with his contracts, or, if he repudiates his contracts, he would have to stand suit upon them.  The railroad company has nothing to do with determining the ultimate destination of the pulp.  The New York brokers make the contracts with the railroad company for the delivery of the pulp from the ship to its ultimate destination.

The position of the Erie Railroad Company and the Hoboken Manufacturers' Railroad Company is that the Commission is without power to fix a rate for the transpor-

tation of wood pulp in carload lots from Hoboken, N. J., to Garfield, N. J., under the facts in this particular case.

In Gulf, Colorado & Santa Fé R. Co. v. Texas, 204 U. S. 403 at 412, 27 S. Ct. 360, 51 L. Ed. 540, the single question was whether a shipment of corn between Texarkana, Tex., to Goldthwaite, Tex., was an interstate or intrastate shipment. The Supreme Court held that this question was determined by the original contract of shipment, and that the contract governed until it was changed by the agreement of the owner and the carrier.

This rule was somewhat modified by subsequent decisions of the Supreme Court, and in Baltimore & O. S. W. R. Co. v. Settle et al., 260 U. S. 166, at 170, 43 S. Ct. .28, 30 (67 L. Ed. 189), Mr. Justice Brandeis stated:

"Whether the interstate or the intrastate tariff is applicable depends upon the essential character of the movement. That the contract between shipper and carrier does not necessarily determine the character was settled by a series of cases in which the subject received much consideration. Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498 [31 S. Ct. 279, 55 L. Ed. 310]; Ohio Railroad Commission v. Worthington, 225 U. S. 101 [32 S. Ct. 653, 56 L. Ed. 1004]; Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U. S. 111 [33 S. Ct. 229, 57 L. Ed. 442]; Railroad Commission of Louisiana v. Texas & Pacific Ry. Co., 229 U. S. 336 [33 S. Ct. 837, 57 L. Ed. 1215]. And in Baer Bros. Mercantile Co. v. Denver & Rio Grande R. R. Co., 233 U. S. 479, 490 [34 S. Ct. 641, 58 L. Ed. 1055], this Court held that a carrier cannot, by separating the rate into its component parts, charging local rates and issuing local way bills, convert an interstate shipment into intrastate transportation, and thereby deprive a shipper of the benefit of an appropriate rate for a through interstate movement."

The court held in that case that the intention of the shipper to ship through governed the character of the movement.

Mr. Chief Justice Taft, in Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U. S. 269, 48 S. Ct. 110 (72 L. Ed. 270), states the facts as follows:

"The important controlling fact in the present controversy, and what characterizes the nature of the commerce involved, is that the plaintiff's whole plan is to arrange deliveries of all its oil purchases on the seaboard of Florida so that they may all be there stored for convenient distribution in the state to the 123 bulk stations and to fuel oil plants in varying quantities according to the demand of the plaintiff's customers, and thence be distributed to subordinate centers and delivery stations, and this plan is being carried out daily. There is neither necessity nor purpose to send the oil through these seaboard storage stations to interior points by immediate continuity of transportation. The seaboard storage stations are the natural places for a change from interstate and foreign transportation to that which is intrastate, and there is nothing in the history of the whole transaction which makes them otherwise, either in intent or in fact. There is nothing to indicate that the destination of the oil is arranged for or fixed in the minds of the sellers beyond the primary seaboard storages of the plaintiff company at Tampa, Port Tampa, Jacksonville or the St. Johns River Terminal."

The court held that the transportation from the seaboard points to the inland points in Florida was an intrastate shipment. The general rules of law are stated as follows:

"The question whether commerce is interstate or intrastate must be determined by the essential character of the commerce, and not by mere billing or forms of contract, although that may be one of a group of circumstances tending to show such character. The reshipment of an interstate or foreign shipment does not necessarily establish a continuity of movement or prevent the shipment to a point within the same state from having an independent or intrastate character, even though it be in the same cars. Chicago, M. & St. P. R. Co. v. Iowa, 233 U. S. 334 [34 S. Ct. 592, 58 L. Ed. 988]. The change from rail to ship has often been held consistent with a continuity of interstate or foreign commerce, even though there may be only local billing. Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U. S. 111 [33 S. Ct. 229, 57 L. Ed. 442]; Railroad Commission of Louisiana v. Texas & Pacific Ry. Co., 229 U. S. 336 [33 S. Ct. 837, 57 L. Ed. 1215]; Baer Bros. Mercantile Co. v. Denver & Rio Grande Railroad Co., 233 U. S. 479 [34 S. Ct. 641, 58 L. Ed. 1055]. On the other hand, in Chicago, M. & St. P. Ry. Co. v. Iowa, supra, the reshipment of an interstate shipment of coal after its arrival in the state in the same carload lots was held not inconsistent with the change from interstate to intrastate commerce. In Baltimore & Ohio S. W. R. R. Co. v. Settle, 260 U. S. 166, 170 [43 S. Ct. 28, 67 L. Ed. 189], a shipper billed his goods from one state to another, paying the interstate freight and reshipped them to another point in the second state, intending from the

first to reach the latter destination, but interrupting the transportation only to take advantage of a difference in his favor between the through rate and the sum of those paid. It was held that the essential nature of the entire movement was in interstate commerce and that the shipper must pay the only lawful rate, which was the interstate commerce rate to the final destination. These cases are illustrations to show that the determination of the character of the commerce is a matter of weighing the whole group of facts in respect to it."

In the present case the essential character of the transaction is in intrastate and not interstate commerce. If the test be the intention of the foreign shipper, suffice it to say that he has the money before the pulp leaves the foreign port and he has it from the New York brokers. How can it be said that he has any concern or any intention that pulp should reach the Hammersley Manufacturing Company, or any one else? And if he did have such intention, what of it, since the New York broker has title until the pulp is delivered on board the cars at Hoboken.

Further than that, mere knowledge by the foreign shipper that the pulp sold to the New York broker is purchased for resale cannot make the shipment by the New York broker to his New Jersey vendee a part of the original movement. If loss has occurred at sea it would not fall on the Hammersley Company because it has no title. It would fall, however, on the New York broker because he has paid for the goods. So it would seem that a new movement starts when the New York broker takes a bill of lading from the railroad for shipment to Garfield. Goods purchased by every New York merchant abroad are in exactly the same category, except for this, that the ordinary merchant only hopes to sell his goods. The New York broker has a contract for resale in each case, but that alone can hardly be said to be sufficient to give a different character to the shipment of the goods.

It is to be borne in mind that there are always two transactions. The American manufacturer deals with the New York broker for obvious reasons. The foreign producer deals with the New York broker for similar reasons. The pulp belongs to the broker when it arrives in New York Harbor, and he initiates the rail transportation. Without the independent act of the New York broker the pulp would never move beyond New York Harbor. The broker stands in the transaction, not as a means of changing the nature of the transaction, but as the instigator of an independent transaction.

The relief prayed for will be granted.