## STANDARD OIL CO. OF KENTUCKY v. ATLANTIC COAST LINE R. CO.

(District Court, W. D. Kentucky, at Louisville. June 10, 1926.)

**1. Equity ☞43—Court has no discretion in applying rule that courts of equity do not have jurisdiction, where plaintiff has plain, adequate, and complete remedy at law (Judicial Code, § 267 [Comp. St. § 1244]).**

In applying rule, declared in Judicial Code, § 267 (Comp. St. § 1244), that courts of equity do not have jurisdiction to grant relief, where plaintiff has plain, adequate, and complete remedy at law, no discretion is left to court.

**2. Courts ☞262(2).**

In order that remedy at law be adequate, defeating jurisdiction of federal court of equity, it must be as complete, practical, and efficient as remedy in equity, and available to plaintiff in federal court.

**3. Equity ☞51(1)—Jurisdiction to prevent multiplicity of suits not exercised when suits are by same person on similar causes of action, unless clearly necessary.**

Equity has jurisdiction to interfere to prevent plaintiff from being subjected to multiplicity of suits, but will not do so where suits are by same person on causes of action arising out of same facts and legal principles, unless clearly necessary to protect plaintiff from continued and vexatious litigation.

**4. Equity ☞51(2)—Causes of action for excess charges on freight shipments are not such multiplicity of suits as is required to give equity jurisdiction, since claims could be united in one suit.**

Causes of action for excess rates charged on different freight shipments are such as could be united in one suit, and would not be such multiplicity of actions as is required to give equity jurisdiction.

**5. Courts ☞262(2).**

In order that remedy at law be adequate, plaintiff must have right to bring suit in his own name by counsel of his selection, with right to direct litigation as in ordinary actions.

**6. Courts ☞262(2)—Remedy under Florida law for recovery of excess freight charges, requiring written demand on railroad commissioners to bring suit against carrier, held not as efficient as remedy in equity, and not to preclude equity jurisdiction (Rev. Gen. St. Fla. 1920, §§ 4649, 4650).**

Remedy for recovery of excess freight charges under Rev. Gen. St. Fla. 1920, §§

4649, 4650, requiring shipper to make written demand on railroad commissioners to bring suit against carrier, *held* not as full, complete, practical, and efficient as remedy given in equity, and not to preclude jurisdiction of court of equity.

**7. Courts ⬤═262(2)—Common-law action to recover excess of freight charges over reasonable charges does not preclude equity jurisdiction of suit to recover excess over rates fixed by railroad commissioners.**

Common-law action permitted in Florida for recovery of excess of freight charges over just and reasonable rates does not preclude equity jurisdiction of suit to recover excess over rates fixed by railroad commissioners, since plaintiff would be required to establish that rates charged were unreasonable, and complicated accounting would be involved, where shipments were numerous.

**8. Courts ⬤═262(2).**

Remedy which must be pursued in state courts alone is not adequate, where plaintiff has constitutional right to resort to federal courts.

**9. Equity ⬤═46.**

Generally remedy in equity as to matters of complicated accounting is regarded as more adequate and efficient than remedy at law.

**10. Carriers ⬤═202.**

Equity *held* to have jurisdiction of cause of action for recovery of excess charges on freight shipments in Florida by nonresident corporation against nonresident railroad company.

**11. Commerce ⬤═33.**

In determining whether or not freight movement is interstate or intrastate, court must look to essential nature of movement, and not merely to its accidents or isolated incidents.

**12. Commerce ⬤═33.**

Intent of shipper at time shipment was made is vital element in determining whether admittedly interstate movement ends at given point.

**13. Commerce ⬤═33—Interstate shipment of gasoline and oil, delivered into storage tanks and later shipped to different points in state, held to end on delivery to storage tanks, there being no question of bad faith.**

Interstate movement of gasoline and oil, shipped into state from different points and there transferred to storage tanks, to be later shipped to different points in state, *held* to end on delivery of products to such storage tanks, and later shipment was intrastate, there being no question of bad faith in having delivery made at storage tanks.

**14. Commerce ⬤═33—Shipper in good faith and for convenience of business has right to gather articles in interstate commerce at distributing points, and thereafter ship articles in separate movement, although bulk of article is not broken or articles transferred from original means of carriage.**

Shipper in good faith and for convenience of business has right to gather articles in in-

terstate commerce at distributing points, and thereafter as demands arise ship articles in entirely separate and distinct movement, even though bulk is not broken, continuity of journey not perceptibly interrupted, nor articles transferred from original means of carriage.

**15. Commerce ⬤═33.**

Distribution of gasoline and oils from storage tanks, to which they are shipped in interstate commerce, to owner's service stations as needs of business demand, *held* local in character, as if made directly to consumer.

**16. Commerce ⬤═33—That fuel oil contracted to consumer before shipped from foreign point to storage place within state held not to render shipment to consumer interstate.**

Shipment of fuel oil from storage point within state *held* intrastate, though contracted to consumer before shipped to storage point from without state, where interstate shipment was ended for storage and safe-keeping until time of delivery, and no particular part of interstate cargo was intended for particular purchaser.

**17. Commerce ⬤═33.**

Continuity of movement is not test in determining character of movement, as to whether interstate or intrastate.

In Equity. Suit by the Standard Oil Company of Kentucky against the Atlantic Coast Line Railroad Company. Decree for plaintiff.

Chas. G. Middleton and Humphrey, Crawford & Middleton, all of Louisville, Ky., for plaintiff.

Helm Bruce and Bruce & Bullitt, all of Louisville, Ky., and Thos. W. Davis, of Wilmington, N. C., for defendant.

DAWSON, District Judge. In this suit, the plaintiff, Standard Oil Company of Kentucky, a corporation organized under the laws of the state of Kentucky, seeks to enjoin the defendant, Atlantic Coast Line Railroad Company, a corporation organized under the laws of the state of Virginia, from charging other than the lawfully published intrastate rates upon its products shipped over defendant's railroad in the state of Florida, from Port Tampa, Tampa, and Jacksonville, to other points in that state over routes wholly within the state. The bill alleges that since June 15, 1923, the defendant has been wrongfully applying interstate rates to these shipments, and an accounting and recovery are asked against the defendant for the difference between the interstate and intrastate rates on these shipments. The particular facts relative to the manner in which plaintiff conducts its Florida business, out of which the shipments in question arise, will be more fully stated here-

after. A temporary injunction was asked by the plaintiff, to which the defendant seasonably objected, and at the same time moved to dismiss the bill because of want of equity therein, and particularly upon the ground that plaintiff has an adequate remedy at law. On the hearing for a temporary injunction the court, in an oral opinion, held that the case was one cognizable in equity, and overruled the motion to dismiss the bill, but denied the motion for a temporary injunction, leaving the merits of the case to be developed upon final hearing. The case has been prepared on its merits and is now before the court on final submission.

[1, 2] The claim of the defendant, that this action is not cognizable in equity because of the existence of an adequate remedy at law, is again urged upon the court, and this question will be first considered. It is an elementary equity rule that courts of equity do not have jurisdiction to grant relief, where the plaintiff has a plain, adequate, and complete remedy at law. Section 267 of the Judicial Code (Comp. St. § 1244) is merely declaratory of this rule, which has always been binding upon the federal courts. In applying this equity rule, no discretion is left to the court. If the plaintiff has a full, complete, and adequate remedy at law, the bill must be dismissed. It is well settled, however, that, to constitute an adequate remedy at law, the remedy must be as complete, practicable, and as efficient, both in respect to the final relief sought and the mode of obtaining it, as is the remedy in equity (Boise Artesian Water Co. v. Boise City, 213 U. S. 276, 29 S. Ct. 426, 53 L. Ed. 796; Tyler v. Savage, 143 U. S. 79, 12 S. Ct. 340, 36 L. Ed. 82; Kilbourn v. Sunderland, 130 U. S. 505, 9 S. Ct. 594, 32 L. Ed. 1005), and must be available to the plaintiff in a federal court.

[3] One ground urged by the plaintiff, in support of its contention that the remedy at law is inadequate, is the familiar one that a multiplicity of suits will result, unless equity is resorted to. It is pointed out that each separate shipment by the plaintiff constitutes a separate cause of action, and, if remitted to its remedy at law, provided one exists, it would have to bring a separate suit upon each shipment to fully protect its rights. One of the recognized grounds of equitable jurisdiction is that plaintiff would be subjected to a multiplicity of suits but for such intervention. Where, however, " * * * the multiplicity of suits to be feared consists in repetitions of suits by the same person against the plaintiff for causes of action aris-

ing out of the same facts and legal principles, a court of equity ought not to interfere upon that ground, unless it is clearly necessary to protect the plaintiff from continued and vexatious litigation." Boise Artesian Water Co. v. Boise City, supra.

[4] It would seem equally sound to hold that, where the multiplicity of suits urged as a basis of equitable jurisdiction consists merely of repeated suits by the plaintiff against the same defendant, upon causes of action identical in nature and arising out of the same facts and based upon the same legal principles, equity ought not to intervene, unless it is clearly necessary to protect the plaintiff from a situation which he himself cannot control. It is true each shipment would constitute a separate cause of action, but a separate suit would not have to be brought on each shipment. The plaintiff could unite in one suit its claims growing out of each shipment made up to the time of filing its suit, and that action would fully determine every question which could be determined in an equity action. There would be no necessity for other suits, except possibly to avoid the statute of limitations, and, as intimated in the case of Boise Artesian Water Co. v. Boise City, supra, such suits would not be such a multiplicity of actions as is required to give equity jurisdiction.

[5, 6] Now, under the Florida law, the state railroad commissioners are given the power, and it is made their duty, to establish rates and charges for the transportation of freight and passengers on and over lines over which they have jurisdiction. These rates are made after an opportunity is given the carrier to be heard, and, when made, they are binding upon the carrier, except it can be shown in a suit in a court of competent jurisdiction that they are unreasonable and confiscatory. When once made, shippers have a right to demand that these rates be applied to all shipments to which they are applicable. That right is expressly given by the statute, and the statute prescribes the method of procedure by which any shipper who has been charged more than the rates fixed by the commissioners may recover the excess. Under sections 4649 and 4650 of the Revised General Statutes of Florida, 1920 edition, any shipper who has been charged by a common carrier more than the rates fixed by the railroad commissioners may make written demand upon the commissioners to bring suit against the carrier thus offending to recover the overcharge, and, if the commissioners fail to comply with the request with-

in 90 days after such written demand, then the shipper is free to prosecute a suit against the carrier in his own name.

The decisions of the Supreme Court of Florida seem to hold that, in an action for the recovery of the excess over the rates fixed by the commissioners, the remedy furnished by the statute is exclusive. The court has no hesitation in holding that the remedy furnished by the statute is not adequate to protect the plaintiff in the statutory right, given it by the laws of Florida, to demand the application of the rates fixed by the commissioners. For a remedy at law to be adequate, the plaintiff must have the right to bring a suit in his own name, represented by counsel of his own selection, with the same right to direct his side of the litigation as is accorded to plaintiffs in other ordinary actions. Such rights are not given the aggrieved shipper by the statute. The action is instituted by the commissioners; the conduct of the plaintiff's case is controlled by the commissioners; the plaintiff's interests are not represented by counsel of his own selection. In short, the statute requires an aggrieved shipper to prosecute his lawsuit by proxy, and he does not even have the right to name his proxy. The law does that for him, and under the law he cannot even settle the suit without the consent of the commissioners. This remedy falls far short of being as full, complete, practicable, and efficient as the remedy given in equity.

[7] It is insisted by the defendant, however, that if the shipper does not want to rely upon his statutory right to have applied to his shipments the rates fixed by the commissioners, and to pursue the statutory remedy provided therefor, he may waive that right and remedy, and sue upon the common-law right to recover any money charged him by the carrier in excess of just and reasonable rates, and that this common-law remedy is as full, complete and adequate as that given in equity. The Supreme Court of Florida has expressly held that this common-law action was not abolished by the right created by the statute, and that an aggrieved shipper may elect which of the two causes of action he will prosecute. Cullen v. Seaboard Air Line Railway Co., 63 Fla. 122, 58 So. 182. A sufficient answer to the defendant's suggestion, however, is that the cause of action asserted by the plaintiff in this case is to recover the difference between the lawfully established intrastate rates and those charged by the defendant, and, as heretofore shown, for this particular cause of action the

remedy at law given by the statute is not adequate. Defendant has suggested that the common-law action recognized by the courts of Florida is not a different cause of action from the statutory one, but merely a different way of enforcing the statutory cause of action; but this contention is not sustained by the Florida decisions, which hold that the common-law action and the statutory action are entirely separate and distinct from each other, and that, where the statutory cause of action is barred by limitation, the common-law action may be maintained, if not itself barred by limitation.

So the statutory action and the common-law action cannot be said to be merely different remedies for the same right, and therefore the common-law action permitted under the law of Florida cannot be said to be the equivalent of the right asserted by the plaintiff in this suit to have the rates fixed by the commissioners applied to the shipments here involved. Should it be conceded that the common-law action to recover money paid on rates in excess of reasonable rates, and this equity action based upon the rates fixed by the commissioners, were but different remedies for the same right, it would not follow that equity would be without jurisdiction. In a suit to enforce the statutory rates as such, the Florida law expressly provides that the rates fixed by the commissioners shall be treated by the courts as prima facie just and reasonable. Indeed, under the rule that the acts of duly constituted governmental agencies acting within their proper sphere are accepted by the courts as prima facie correct, that would be the rule if the Florida law contained no such provision.

So, in an equity action against the railroad company to enforce the rates fixed by the Florida railroad commissioners, if any question should arise as to the reasonableness of the rates relied upon, the burden would be upon the railroad company to establish their unreasonableness. On the other hand, in a common-law action to recover money paid in excess of reasonable rates, it would be necessary for the plaintiff, in order to recover at all, to allege that the rates charged by the carrier were unreasonable and extortionate, and the burden would be upon plaintiff to prove their unreasonableness. No recovery could be allowed a plaintiff in such an action until he had established to the satisfaction of the jury, not only that the rates charged were unreasonable, but the extent of their unreasonableness. This

would throw upon a plaintiff in the common-law action a burden that he is not required to assume in an action in equity for the recovery of rates charged in excess of those fixed by the commissioners, and it might be entirely possible that the rates fixed by a jury as reasonable in a common-law action would not to any extent coincide with the rates fixed by the state railroad commissioners.

[8] So it is extremely doubtful if a remedy at law which throws upon the plaintiff the burden of proving that rates charged are unreasonable, and leaves to a jury the decision of such a question, is as full, practicable, complete, and efficient, either as to the final relief or the method of obtaining it, as is an equitable remedy which imposes no such burden upon the plaintiff. It may be suggested that this is a theoretical difficulty, and not an actual one, for the reason that the Florida courts hold that even in the common-law action the schedule of rates fixed by the commissioners is prima facie evidence of what are reasonable rates; but it must be remembered that, so far as the common-law right is concerned, the Florida statute is merely a rule of evidence, and has no extraterritorial effect. The entire burden would be with the plaintiff in such a case, and it appears to this court that it would be contrary to sound principles to hold that a rate fixed by the railroad commissioners of Florida, which is in no sense the basis of the action, would be prima facie evidence of the unreasonableness of the rate charged by the carrier. Of course, the plaintiff could bring its action in the state courts of Florida and get the benefit of the statutory presumption; but a remedy is not adequate which must be pursued in the state courts alone, where the plaintiff has the constitutional right to resort to the federal courts, as in this case. Plaintiff could probably get the benefit of the statutory presumption in the federal court of Florida, but it cannot sue the defendant in that court, because neither the plaintiff nor the defendant are citizens or residents of that state, within the meaning of the Judicial Code. So, in trying to enforce in this court its common-law right of action, the plaintiff would be confronted with substantial obstacles, with which it is not confronted in this equity action.

[9] Again, in an action at law to recover money paid to a carrier in excess of reasonable rates, the question of what is a reasonable rate in any particular case would be a question of fact to be submitted to the jury. To determine what is a reasonable rate is always a most difficult problem for those trained in the consideration of such questions, and it is safe to say an almost impossible one for a jury. Furthermore, in a common-law action, as in this equity action, the plaintiff's claim would be made up of alleged excessive charges on many shipments of different commodities from and to different points, probably carrying different rates. Not only would it be necessary to establish the reasonable rate on each commodity from and to the different points involved, but a complicated accounting would be necessary, and in matters of complicated accounting the remedy in equity is generally regarded as more adequate and efficient than the remedy at law. Story, in his work on Equity Jurisprudence, section 450, recognized this fact by stating, "There can be no real doubt that the remedy in equity, in cases of accounting, is generally more complete and adequate than it is or can be at law;" and this statement of Story's was quoted with approval by the Supreme Court in the case of Kilbourn v. Sunderland, 130 U. S. 505, 9 S. Ct. 594, 32 L. Ed. 1005.

[10] For the reasons stated, the court is satisfied that the common-law remedy afforded plaintiff is not as efficient, either as to the final relief sought or the mode of obtaining it, as afforded by this court sitting as a court of equity, and, in view of the conclusions already announced as to the inadequacy of the statutory remedy, it follows that the court is of opinion that equity has jurisdiction of the cause of action stated in the bill.

Coming to the merits of the case, which involve the question of whether interstate or intrastate rates should apply on the movement of plaintiff's products involved in this case, a somewhat detailed statement of the manner in which plaintiff's business is conducted in the state of Florida becomes necessary. The plaintiff is engaged, in the state of Florida, in the business of buying and selling gasoline, refined oil, lubricating oil, fuel oil, and other petroleum products, and has been so engaged for many years. There is little, if any, dispute about the way in which this business is conducted. As alleged in the pleading and established by the evidence, the business is conducted in substantially the following way:

Plaintiff maintains at Port Tampa, Tampa, and Jacksonville, all in the state of Florida, very large storage facilities, consisting of tanks and warehouses for receiving and storing gasoline, refined oil, fuel oil, and lubricating oil. Plaintiff does not produce

nor refine any of these products sold by it to its customers in Florida, but, with the exception of fuel oil, practically all of them are purchased from the Standard Oil Company of Louisiana, and supplied by that company from its refineries at Baton Rouge, La., and its fuel oil is purchased from the Standard Oil Company of New Jersey, and supplied by that company from its source of supply at Tampico, Mexico, and all of the products so purchased are brought into Port Tampa and Jacksonville in tank steamers owned or chartered by the sellers, and, with the exception of lubricating oil, are pumped by ships' pumps from the steamers through pipe lines owned by the plaintiff into plaintiff's storage tanks at Port Tampa and at St. Johns River Terminal, Jacksonville, Fla. Lubricating oil is pumped from the tank steamers by ships' pumps into tank cars, and by them conveyed over defendant's lines to plaintiff's storage tanks at Tampa, a distance of about nine miles from Port Tampa, and to King's Road, a distance of about two miles from St. Johns River Terminal.

All of these products are purchased by plaintiff, to be delivered to it by the sellers at Port Tampa and Jacksonville, title not passing to the plaintiff until the products have been so delivered; settlement between the seller and purchaser being made upon the basis of the amount actually delivered into tank cars and tanks. The prices to be paid for gasoline, refined oil, and lubricating oil are the current market prices in effect at the time the products are delivered to plaintiff at Port Tampa and Jacksonville. Fuel oil is purchased on yearly contracts at stipulated prices. The tank cars used by the plaintiff in its business are not owned by the railroad company, but are leased by the plaintiff and hauled by the defendant over its lines in common carrier service.

At Port Tampa plaintiff maintains for the storage of gasoline five tanks, with an aggregate capacity of 110,000 barrels, for refined oil, storage tanks with a total capacity of 20,000 barrels, and for fuel oil, tanks with a total capacity of 127,000 barrels; and at Jacksonville it maintains for the storage of gasoline, tanks with a total capacity of 162,000 barrels, for refined oil, storage tanks with a capacity of 40,000 barrels, and for fuel oil, storage tanks with a total capacity of 145,000 barrels.

All of the gasoline, refined oil, fuel oil, and lubricating oil delivered to plaintiff at Port Tampa is sold in the state of Florida, while about 70 per cent. of the gasoline and refined oil received by plaintiff at St. Johns River Terminal is sold in the state of Florida, as is practically all of the fuel oil and lubricating oil received at that point. Plaintiff's purchases of gasoline, refined oil, and lubricating oil are made currently as the needs of the business and the condition of the market seem to justify, and at the time the purchases are made and at the time the product is received into the plaintiff's storage tanks at Port Tampa and St. Johns River Terminal it has not been sold, and plaintiff does not know to whom it will be sold, when it will be sold, where it will eventually go, nor when it will be taken out of the storage tanks. None of the gasoline, refined oil, fuel oil, nor lubricating oil received in the storage tanks at Port Tampa is disposed of locally, as there is no demand for any of same at that point, and the same thing is substantially true at Jacksonville; plaintiff knowing at the time said products are purchased that they will ultimately be shipped to and disposed of at other points in Florida, and, to a small extent, in the states of Georgia and Alabama, from the Jacksonville tanks.

Throughout the state of Florida the plaintiff maintains bulk stations, where it has sufficient tankage and storage facilities for gasoline, refined oil, and lubricating oil to meet the current needs of its customers supplied from the respective bulk stations. These bulk stations ordinarily get their supply of gasoline and refined oil from the storage tanks maintained at Port Tampa and Jacksonville, same being delivered to the bulk stations by means of tank cars; no gasoline or refined oil being delivered to consumers directly from the storage tanks at Port Tampa and Jacksonville. The gasoline and refined oils are delivered from the bulk stations to plaintiff's customers by means of tank wagons. Plaintiff also maintains a large number of service stations in the state of Florida, which, in the usual course of business, are supplied with gasoline and refined oil directly from the bulk stations, although occasionally a service station is supplied with gasoline shipped in tank cars directly from Port Tampa and Jacksonville.

Under ordinary business conditions plaintiff keeps in its storage tanks at Port Tampa and at Jacksonville a sufficient supply of gasoline and refined oil to take care of its requirements for from 45 to 60 days, a sufficient supply of fuel oil to take care of its requirements for from 30 to 60 days, and in its storage tanks at Tampa and at King's Road a sufficient supply of lubricating oil to take care of its requirements for from 60

to 90 days, the exact time depending entirely upon business conditions and demands for the products in that section of Florida supplied from the respective storage tanks. The plaintiff pays local taxes to the state of Florida on all of its products on hand in its storage tanks on the Florida assessing dates. After the lubricating oil is placed in the storage tanks at Tampa and at King's Road, it is distributed as sold in tank wagons, barrels, and smaller containers, although a small percentage of same is sent out in tank cars to plaintiff's bulk stations.

Approximately 95 per cent. of the fuel oil sold by plaintiff in Florida is on contracts made before the oil has been shipped from the point of origin to plaintiff at Port Tampa and Jacksonville. Most of these contracts are for a period of a year, covering the requirements of the various consumers, with average monthly deliveries stipulated, although in actual practice shipments from the storage tanks to the consumers are accommodated to their needs. There is no separation of the fuel oil under contract from that not under contract, all being of the same grade. At the time the shipment of the fuel oil is made from the point of origin, plaintiff cannot say where any particular cargo of same, or any part thereof, will go after it has been pumped into the storage tanks, to whom it will go, nor when it will be shipped out from the storage tanks. At the time of shipment from the point of origin, the only destinations which can be given are Port Tampa and Jacksonville, respectively.

The defendant company has nothing to do with the boat movement of the products used by the plaintiff in its Florida business. There is no through rate and no joint arrangement of any character between the water carrier and the defendant. Movement by boat, while interstate commerce, is not subject to regulation by the Interstate Commerce Commission. From two to four boats per month, with an average capacity of 45,000 barrels each, discharge their cargoes in plaintiff's storage facilities at Port Tampa and Jacksonville each month. A boat requires from one to three days to discharge its cargo, and, while boats are engaged in discharging their cargoes into the storage tanks of plaintiff, tank cars are being loaded from the same storage tanks, for the purpose of supplying plaintiff's bulk stations, service stations, and customers.

Plaintiff has been conducting its business in the manner here stated for many years, and it was not adopted for the purpose of evading the payment of interstate rates. That is merely the fixed, settled course of conducting its business. No question of bad faith on its part is suggested by the record. Its business could not be conducted without the storage facilities herein described, and until June 15, 1923, all shipments by the plaintiff from Port Tampa, Tampa, and Jacksonville, over defendant's lines to other points in Florida, over purely intrastate routes, were accepted by the defendant as intrastate commerce. Since June 15, 1923, the defendant has classified these shipments as interstate commerce, and collected freight on the basis of interstate rates.

[11] In determining whether or not a particular movement is interstate or intrastate, the court must look to the essential nature of the movement, and not merely to its accidents nor its isolated incidents. The question is not determined by the character of billing, the mere form of contract between carrier and shipper, or the continuity of movement or lack thereof, by whether the shipment has been in the continuous possession of the carrier, or by whether the bulk has or has not been broken. Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310; Ohio Railroad Commission v. Worthington, 225 U. S. 101, 32 S. Ct. 653, 56 L. Ed. 1004; Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442; Railroad Commission of Louisiana v. Texas & Pacific Railway Co., 229 U. S. 336, 33 S. Ct. 837, 57 L. Ed. 1215; Baer Bros. Mercantile Co. v. Denver & Rio Grande R. R. Co., 233 U. S. 479, 34 S. Ct. 641, 58 L. Ed. 1055; B. & O. S. W. R. R. Co. v. Settle, 260 U. S. 166, 43 S. Ct. 28, 67 L. Ed. 189; Missouri v. Kansas Gas Co., 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027.

[12] Where the question, as is the case here, is whether an admittedly interstate movement ends at a given point, a vital element is the intent at the time the shipment is made of the person having control of the shipment and its future movement after its arrival at the point in dispute, and the intent is not that which he forms after the initial movement has begun, nor after the arrival of the shipment at the given point, but the question is: What was his real intent at the time the initial movement began? If, at that time, his real purpose was that the movement should definitely and in good faith end at the given point, and that any future movements of the shipment from that point should be as the result of a new and independent arrangement in good faith made,

then all the authorities seem to agree that the character of the second movement is in no sense colored by the first movement, nor is it considered a part thereof.

[13] Measured by this rule, it seems to the court that the interstate journey of the gasoline, refined oil, and fuel oil involved in this case, ends upon the delivery of those products into plaintiff's storage tanks at Port Tampa and Jacksonville, respectively, and that the interstate journey of the lubricating oil, if it does not end upon the delivery of same into the tank cars into which it is pumped at Port Tampa and Jacksonville, certainly ends when those tank cars have delivered their contents into the storage tanks at Tampa and King's Road, maintained by the plaintiff for the storage of lubricating oil. There is no question in this case of bad faith on the part of the plaintiff in having its purchases delivered to it at Port Tampa and Jacksonville. It is not for the purpose of ostensibly, but not in good faith, ending an interstate movement, in order to get the benefit of a lower intrastate rate on subsequent movements of the products. This fact distinguishes this case from that of B. & O. S. W. R. R. Co. v. Settle, supra. In that case it was admitted that the sole purpose of billing the product from the mill in the South to Oakley, Ohio, and from there rebilling it to Madison, Ohio, at the local rate, was to get the advantage of a cheaper rate, by thus combining an interstate rate with an intrastate one, notwithstanding the admitted fact that, at the time the initial movement began, the real destination intended was Madison, rather than Oakley. The movement was essentially national in its character, and to have permitted such an admitted subterfuge to defeat national control would have opened the door to all kinds of evasions and unlawful preferences.

In the case at bar the movement from storage to other points in Florida is essentially local in character. The stoppage is not to defeat a through rate—there is none. It is not merely a halting for convenience of carriage. While as a practical matter it is necessary upon arrival at the port to place the cargoes in storage before they can be loaded into cars and carried to the various points of ultimate destination, the plaintiff has another and as equally important purpose in so handling the cargoes, viz. convenient and economical handling and distribution of its products. In the absence of bad faith, it is submitted that the fortuitous circumstance that the manner in which plaintiff handles its products upon delivery to it is also a convenient means of changing from water transportation to rail transportation should not be made the basis of impressing upon a purely local intrastate movement a national character.

[14] It is argued that plaintiff knows, before any of the products start from the point of origin, that they will not be disposed of at the points where they are unloaded from boats, but that they will ultimately move further into the interior of Florida, and that therefore the original movement, interstate in character, cannot be said to have ended until ultimate destination has been arrived at. This contention overlooks the right of a shipper in good faith and for the convenience of his business to gather in interstate commerce the articles in which he deals, at distributing points, and thereafter, as the demands of his business arise, ship the articles so gathered in an entirely separate and distinct movement from the original one, even though the bulk of the article is not broken, the continuity of the journey not perceptibly interrupted, nor the articles transferred from the original means of carriage. Chicago, Milwaukee & St. Paul R. R. Co. v. Iowa, 233 U. S. 334, 34 S. Ct. 592, 58 L. Ed. 988. If a shipper did not have this right, then no jobbing concern, gathering its articles by interstate commerce into its central warehouse, could ship these articles from the warehouse in the regular course of business to other points in the same state as the warehouse at intrastate rates. Yet such is the common practice, and recognized by Mr. Justice Brandeis in the case of B. & O. S. W. R. R. Co. v. Settle, supra, as entirely proper and legitimate. In that case, in discussing this recognized practice the court said:

"The instances are many where a local shipment follows quickly upon an interstate shipment, and yet is not to be deemed part of it, even though some further shipment was contemplated when the original movement began. Shipments to and from distributing points often present this situation, if applicable tariffs do not confer reconsignment or transit privileges. The distinction is clear between cases of that character and the one at bar, where the essential nature of the traffic as a through movement to the point of ultimate destination is shown by the original and persisting intention of the shippers, which was carried out."

[15] It is suggested by the defendant, however, that the storage tanks at Port Tampa and Jacksonville, and at Tampa and King's Road, cannot be considered distributing

points, because, in the main, distribution to the consumers is not made from these points, but from plaintiff's bulk stations and service stations. It seems to the court that this distinction is a hypertechnical one, and no authority is cited to sustain the contention that points of distribution, from which local shipments free of interstate character may be made, must be points from which distribution directly to the consumers is made. It seems to the court that distribution from these storage tanks to other places of business of the plaintiff in the state of Florida, as the needs of its business demand, where the particular movement was not definitely intended and in mind at the time the original interstate movement commenced, is as much local in its character as if the second movement had been directly to the consumer.

[16] Furthermore, the contention of the defendant, that the movement from the storage tanks to the bulk stations and service stations is not a local distributing movement, entitled to take the intrastate rate is not altogether consistent with its further contention that the movement of fuel oil from the storage tanks directly to the consumer must take the interstate rate. The defendant would avoid this seeming inconsistency, however, by the manner in which plaintiff's fuel oil business is conducted. It is argued that, inasmuch as this fuel oil is contracted in large part to consumers before it is shipped from Tampico, and the points of delivery to consumers are known to the plaintiff at the time of the beginning of the initial movement, the interstate journey cannot be considered ended until it has been delivered to the consumer, and in support of this contention it largely relies upon the cases of Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442, and Railroad Commission of Ohio v. Worthington, Receiver, etc., 225 U. S. 101, 32 S. Ct. 653, 56 L. Ed. 1004.

In this contention defendant apparently loses sight of the fact that, at the time the movement from Tampico starts, it is plaintiff's definite intention to end the interstate journey at Port Tampa and Jacksonville— not for the purpose of avoiding the interstate rate, nor for convenience of carriage alone, but for fixed and definite business purposes, viz. for storage and safe keeping until time of delivery arrives. In determining the essential character of the movement, it is important also to remember that, notwithstanding the fact that this product is sold before it starts from Tampico, no particular part of the cargo is destined or intended

for any particular purchaser, nor for delivery at any particular place beyond the ports, at any particular time, and, while it is true that all of the oil is of the same grade, yet, when the time comes to make delivery to the contract purchasers, a separation from stock is just as essential as in the case of a hardware merchant, who must select, from a stock of shovels exactly alike, the shovels he has sold to a retail merchant.

[17] Much is made of the alleged practically continuous flow of oil from ship to storage tanks, from storage tanks to tank cars, and thence to the bulk stations and consumers, and the movement is painted as a continuous flow of oil in interstate commerce, through the tanks, to ultimate destination. Conceding the premise, we are again reminded that continuity of movement is not the test in determining the character of the movement. On this particular contention of the defendant the case of Public Utilities Commission of Kansas v. Landon, 249 U. S. 236, 39 S. Ct. 268, 63 L. Ed. 577, is illuminating. In that case the court held that, while piping natural gas from one state to another, and there delivering it to independent local gas companies, is interstate commerce, the movement of the gas by the local companies from the point where they receive it from the pipe line company to their local consumers is intrastate commerce, and not a continuation of the interstate movement, even though the mains of the local companies are permanently connected with those of the pipe line company, and there is no interruption of the flow of the gas from the pipe lines to the mains of the local companies.

The two cases above referred to, and relied upon so strongly by the defendant, do not seem to the court to be in point.

In the Sabine Tram Case the question was whether or not the shipment of lumber from the mills where it was manufactured at Ruliff, Tex., to Powell & Co., the purchasers, at Sabine, Tex., on the Gulf of Mexico, was an interstate shipment or an intrastate shipment. There, as in every other such case, the question was: What was the essential character of the movement from Ruliff to Sabine? and it became important to know what the intention of Powell & Co. was at the time the shipment left Ruliff. The undisputed facts were that Powell & Co. were engaged in the purchase of lumber for export to Europe, by way of the port of Sabine; that contracts had been made for the sale of the lumber before the logs out of which it was manufactured had left the state of Louisiana for the mill at Ruliff, Tex., and

before Powell & Co. had purchased the lumber from the Sabine Tram Company, it being purchased expressly for export to fill the contracts. Powell & Co. had chartered ships to receive the lumber at Sabine, upon its delivery there, before any great part of the lumber had been delivered. At the time it was shipped from the mill it was Powell & Co.'s intention to have it loaded promptly upon the ships for carriage to Europe. Powell & Co., as had been its intention from the start, claimed for the shipments when they arrived at Sabine the free time allowed for unloading cars carrying freight intended for export, and after the lumber had been unloaded on the railroad company's premises, and before its transfer to the ships, freedom from storage allowed on export shipments. Powell & Co. at all times regarded the shipments as export shipments, and viewed the stoppage at Sabine as a necessary incident in transferring the shipments from rail to water carriage. In view of these uncontroverted facts, the court, of course, came to the conclusion that the movement from Ruliff to Sabine was a part of a continuous foreign movement, and that such was the intention of Powell & Co., who had control of the shipment after its arrival at Sabine, from the very time the initial movement started. It would seem that the recitation of these facts so clearly distinguishes the Sabine Tram Case from the case at bar as to make further comment unnecessary.

In the case of Railroad Commission of Ohio v. Worthington, Receiver, etc., supra, the question was whether or not the Railroad Commission of Ohio had the right to fix the rate at which coal should be carried from certain mining districts in the state of Ohio to the ports of Huron and Cleveland, Ohio, on Lake Erie, for carriage from those points by vessels furnished by the coal operators to points in other states; the rate covering, not only the service of carriage from the coal field to the lake ports, but the further service of unloading the coal from the railroad cars into the vessels, and so distributing it in the holds of the vessels as to balance the cargo, so that the vessels might proceed safely. The court stated the question involved in the following language: "Does the transportation which the rate prescribed by the Railroad Commission of Ohio covers constitute interstate commerce?" It was held that the actual placing of the coal in the vessel and the distribution of it in the hold of the vessel, in cases where the cargo was intended for carriage outside of the state of Ohio, were acts connected with, and a part of the interstate movement of the cargo, and that the attempt of the Railroad Commission of Ohio to regulate this charge was an interference with and burden upon interstate commerce.

In the case at bar, as has been pointed out, the local movements from plaintiff's storage facilities to other points in Florida are not preconceived parts of the interstate movements beginning at the refineries and at Tampico, but are separate and distinct movements, arranged for and commenced after the termination of the interstate movements.

Numerous other cases are thought by plaintiff and defendant to be applicable to the case at bar, but in each of those cases, except the cases of Atlantic Coast Line R. R. Co. v. Standard Oil Co. of New Jersey and Seaboard Air Line Ry. Co. v. Standard Oil Co. of New Jersey, 12 F.(2d) 541, heard and decided together by the Circuit Court of Appeals for the Fourth Circuit on April 14, 1926, and which were decided in accordance with the views herein expressed, the facts were essentially different from those in the case at bar, and therefore no useful purpose will be served in reviewing them at length.

For the reasons stated, the court is of opinion that the movements in question in this case are intrastate movements and should take the intrastate rates.

Inasmuch as the parties have indicated that the question of accounting probably can be agreed upon, the appointment of a special master to state the account between the parties will be left open, and the entry of a decree conforming to the views herein expressed will be held open pending such agreement, or notice that agreement cannot be arrived at.