**EICHHOLZ v. HARGUS et al., Public Service Commissioners.**
**No. 660.**

District Court, W. D. Missouri, Central Division.
March 24, 1938.

D. D. McDonald, of Jefferson City, Mo., for plaintiff.

Daniel C. Rogers, of Jefferson City, Mo., for defendants.

Before STONE, Circuit Judge, and REEVES and OTIS, District Judges.

REEVES, District Judge.

This is a suit to enjoin the cancellation or revocation of a permit granted to plaintiff as an interstate motor carrier, and bearing date November 23, 1934. The order of revocation was made effective December 30, 1936. A temporary injunction was granted January 23, 1937, and

the case was tried and submitted on final hearing February 2, 1938.

■ An order of a state administrative board being challenged, a three-judge court was constituted in conformity with Section 380, Title 28 U.S.C.A.

Section 5268(b), Laws Missouri 1931, Mo.St.Ann. § 5268(b), p. 6685, relating to Motor Vehicles, provides for the granting of permits by the Public Service Commission of the State of Missouri to motor carriers desiring "to use any of the public highways of this state for the transportation of persons or property, or both, in interstate commerce * * *."

In accepting such permits the carriers become obligated to pay certain license fees at times and in accordance with schedules prescribed by law.

By section 5269, Laws Missouri, 1931, supra, Mo.St.Ann. § 5269, p. 6686, "The commission may at any time, for good cause, suspend, and upon at least ten days notice to the grantee of any certificate, and an opportunity to be heard, revoke, alter or amend any certificate issued under the provisions of the act."

The permit granted to the plaintiff by the Public Service Commission of Missouri authorized him to "operate interstate as a freight carrying motor carrier over an irregular route as follows: From all points in Missouri to points beyond the state and from points beyond Missouri to all points within the state, exclusively in interstate commerce."

At the time this permit was granted there was in effect a rule (having the force of law) promulgated by the Public Service Commission of Missouri as authorized by Statute, and known as Rule No. 44. By this rule the holders of interstate permits were forbidden to transport within the state property accepted in the state and "known to be destined to a point within the state of Missouri." It was further provided that "if such interstate carrier accepts within Missouri property destined to a point beyond the limits of the state of Missouri such property shall not be terminated within the state of Missouri."

The reason for the attempted cancellation of plaintiff's interstate permit was, as it was charged, that he was operating in violation of said permit. Such violation consisted in carrying property from one point in Missouri to another point in

Missouri as an intrastate carrier whereas he did not have a license as such.

Although the plaintiff made no complaint of the license fees exacted under the laws of Missouri, nevertheless, he has not paid the usual fees since the granting of the temporary restraining order on December 31, 1936. He has been carrying on his regular business as a carrier under the protection of this court's restraining order. As a result, a supplemental answer has been filed asking this court to grant a hearing in the nature of an accounting of fees to the State of Missouri from the plaintiff on account of his operations since the protective restraining order was granted.

The temporary injunction heretofore granted by this court was predicated upon the record of evidence before the Public Service Commission, ex parte affidavits, and some additional oral testimony. At that time it was made to appear that a small percentage of the property carried by plaintiff was between points in Missouri, and that such transportation was effected by carriage from St. Louis, Missouri, to a terminal station in Kansas City, Kansas, and, that, because of a zone within which a pickup service was authorized, a small amount of property was picked up in Kansas City, Missouri, assembled at the terminal in Kansas City, Kansas, and then transported to St. Louis, Missouri, for delivery.

The facts as then presented warranted the court in issuing a temporary injunction, as a matter of judicial "convenience" until final hearing on the merits. Plaintiff has regular line hauls and fixed terminal depots. Its chief line hauls are between its terminals or depots at St. Louis, Missouri, Kansas City, Kansas, Wichita, Kansas, Des Moines, Iowa, and Burlington, Iowa. Between these points admittedly it hauls a large volume of freight. From its depot or terminal point at Kansas City, Kansas, it has a pickup zone with a radius of twenty-five miles. Its terminal in Kansas City, Kansas, is within one-half mile of the Missouri State Line and a very few blocks from the trafficway connecting Kansas City, Kansas, with Kansas City, Missouri.

At that point, according to the testimony, it is in very close proximity to several heavy shippers, including meat packers. There is an inference from the testimony that it hauls considerable property for these shippers. During its operations it has carried a great deal of merchandise from shippers or consignors at St. Louis, Missouri, to consignees in Kansas City, Missouri. In many instances such shipments were made in truckload lots so that the plaintiff continued the line haul from his terminal in St. Louis to the depot or terminal in Kansas City, Kansas, and a new driver, and probably a new tractor, made the delivery by transporting the same merchandise or property back into Missouri over the identical trafficways used in going to the terminal in Kansas City, Kansas.

Plaintiff testified that its transportation of property or merchandise between points in Missouri aggregated 10 per cent. of his traffic. One witness for the defendant testified that the percentage aggregated 40 per cent. of the entire business across the state. Another witness testified that the intrastate traffic would aggregate 25 per cent. of the total volume. In many instances it was the habit of shippers in Missouri to consign their merchandise to themselves or some person at the terminals in Kansas City, Kansas, and then reconsign the same merchandise to a Missouri point.

Other facts will be stated as they become pertinent in the course of this memorandum opinion.

■ 1. At the outset, it is contended by the plaintiff that, having engaged in interstate commerce, the acts of Congress would be supreme and exclusive, and that he is not subject to supervision by state authorities.

Such was the holding in Missouri Pacific Railroad Co. v. Stroud, 267 U.S. 404, loc. cit. 408, 45 S.Ct. 243, 69 L.Ed. 683. The court said (page 245): "It is elementary and well settled that there can be no divided authority over interstate commerce, and that the acts of Congress on that subject are supreme and exclusive."

An examination of the national Motor Carrier Act, 49 U.S.C.A. § 301 et seq., however, does not reveal an intention of the Congress to occupy the entire field and to exclude the authority of the states. Section 302, Title 49 U.S.C.A., contains a "Declaration of policy and delegation of jurisdiction to Interstate Commerce Commission." By subdivision (a) of said Section it is the expressed purpose of the

Congress to "cooperate with the several States and the duly authorized officials thereof * * * in the administration and enforcement of this chapter." And then, by subdivision (c): "Nothing in this chapter shall be construed to affect the powers of taxation of the several States or to authorize a motor carrier to do an intrastate business on the highways of any state, or to interfere with the exclusive exercise by each State of the power of regulation of intrastate commerce by motor carriers on the highways thereof."

It will be seen from the foregoing that it was the intention of the Congress to leave with each state the exclusive right to regulate and control intrastate commerce by motor carriers on the highways of such states. This exclusive right could not be exercised properly if the state were compelled to await a determination and a conclusion of the interstate commerce commission in every case as to whether traffic belonged to interstate commerce or to intrastate commerce. It must be obvious that in case the Interstate Commerce Commission should determine that a particular haul or carriage was interstate commerce, a ruling to the contrary by the state authorities would be unavailing, but in the absence of conflict, the decision of the State authorities would prevail.

Again, it appears from the evidence that the Interstate Commerce Commission, because of a congestion of applications from motor carriers, has been unable to exercise prompt supervision over interstate motor carriers.

In the case of Sproles v. Binford, 286 U.S. 374, loc. cit. 390, 52 S.Ct. 581, loc. cit. 585, 76 L.Ed. 1167, the court said:

"'In the absence of national legislation especially covering the subject of interstate commerce, the state may rightly prescribe uniform regulations adapted to promote safety upon its highways and the conservation of their use, applicable alike to vehicles moving in interstate commerce and those of its own citizens.'"

This principle was taken and approved from the case of Morris v. Duby, 274 U. S. 135, 47 S.Ct. 548, 71 L.Ed. 966.

The rule announced in the Minnesota Rate Cases, Simpson v. Shepard, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A., N.S., 1151, Ann.Cas.1916A, 18, was to the effect that the states may act within their respective jurisdictions until Congress sees

fit to act. In this case, while the Congress has acted, it has not only left with the states a large measure of authority in determining what is and what is not intrastate commerce, but it has not as yet been able to make its legislation effective. Until that has been done, the federal courts must, in a large measure, recognize state regulations and follow the decisions upon such regulations by the duly constituted state authorities. In this case, the Public Service Commission of the State, after due process, has determined that the plaintiff was engaging in intrastate commerce, and that because of such violation of its interstate permit the commission exercised its right under the statute to cancel such permit.

█ 2. However, assuming that the ruling of the Public Service Commission of Missouri is not binding upon us, in the absence of a definite contrary ruling by the Interstate Commerce Commission, the question for us to determine is whether the operations of the plaintiff as gleaned from the above facts were, in part at least, intrastate. This is purely a factual question. Ohio Railroad Commission v. Worthington, 225 U.S. 101, 102, loc. cit. 108, 32 S.Ct. 653, 56 L.Ed. 1004.

As said in the last case, loc. cit. 110, 32 S.Ct. loc. cit. 656, "The test of through billing is not necessarily determinative" of the question as to whether it is intrastate or interstate commerce.

The subject was discussed in Southern Pacific Terminal Co. v. Interstate Commerce Commission and Young, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310, where a shipment was made from sundry points in Texas to a shipper as consignee at Galveston. At that point the property shipped was prepared for export. The court properly held that such transportation was within the jurisdiction of the Interstate Commerce Commission. The shipper was denied the advantage of a lower tariff, because the court said that it constituted an undue preference in his favor.

In the case of Baltimore & Ohio S. W. R. R. Co. v. Settle, 260 U.S. 166, loc. cit. 170, 43 S.Ct. 28, loc. cit. 30, 67 L.Ed. 189, the court said:

"And whether the interstate or the intrastate tariff is applicable depends upon the essential character of the movement. That the contract between shipper and carrier does not necessarily determine the

character was settled by a series of cases in which the subject received much consideration."

The court then cited some of the cases hereinbefore discussed, as well as Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; Railroad Commission of Louisiana v. Texas & Pac. Ry. Co., 229 U.S. 336, 33 S. Ct. 837, 57 L.Ed. 1215.

Conversely to the contentions here made, the Supreme Court held in Baltimore & Ohio Co. v. Settle, supra, adopting the same principle announced in Baer Bros. Mercantile Co. v. Denver & R. G. R. R. Co., 233 U.S. 479, 34 S.Ct. 641, 58 L. Ed. 1055:

"That a carrier cannot, by separating the rate into its component parts, charging local rates, and issuing local waybills, convert an interstate shipment into intrastate transportation, and thereby deprive a shipper of the benefit of an appropriate rate for a through interstate movement."

In this case, the plaintiff hauled truckloads of merchandise from shippers or consignors in St. Louis, Missouri, to consignees in Kansas City, Missouri. It was neither a normal nor a natural route, to extend the carriage to the terminal depot in Kansas City, Kansas. There was no reason for it. It was not a matter of convenience to the shipper, nor was it a matter of convenience to the carrier. Immediately that the haul terminated at the depot or terminal in Kansas City, Kansas, a new driver and in some instances with the same tractor took the merchandise or property back over the same trafficway and effected immediate delivery in Kansas City, Missouri. It was patent that the object of the shipper was to secure the benefit of a lower tariff by converting the shipment into an interstate haul. The shipping charges were approximately one-third less if in interstate commerce than if in intrastate commerce.

The plaintiff has cited in support of his contention the very recent case of Roundtree v. Terrell et al., D.C., 22 F.Supp. 297 decided February 17, 1938, in the Northern District of Texas. That case, as this case, pended before a three-judge court. The motor carrier hauled merchandise from points in Texas, through Texarkana to Little Rock, Arkansas. Some of the shipments or consignments were unloaded at a terminal or depot in Texarkana, Arkansas,

and then carried back and delivered to consignees at Texarkana, Texas. The Texas court upheld the operation as interstate commerce. In doing so, it said that the pickup or delivery truck at Texarkana was not a line haul truck, but it was a local truck bearing an Arkansas license. It said, furthermore, that the merchandise from the line haul came to rest and was unloaded at the carrier's depot in Texarkana, Arkansas. The court further found concerning the shipment (page 299):

"It is unloaded there in the nighttime, and the next morning the local delivery truck makes delivery of it within the municipal limits to whichever side of the city it may be consigned. * * * The line trucks reach Texarkana about 4 or 5 o'clock in the morning, all places of business are closed, such freight as is consigned to that point is unloaded and locked in the warehouse, the line truck then proceeds on to Little Rock. * * * The freight which originates in Texas and is subsequently delivered to Texarkana, Tex., must be and is transported over the line into Arkansas, and comes to rest in the warehouse in that state."

The court then said concerning this method of operation:

"It would not seem appropriate to compel the complainant to deliver freight in Texarkana, Tex., as he passes through in the nighttime, rather than following his legally chosen method of unloading it at his warehouse and then delivering it to the consignee, by another carrier, during business hours."

The situation here is vastly different. In a few instances no doubt the merchandise picked up at St. Louis is unloaded at the terminal or depot in Kansas City, Kansas, and, in that event, as we held on our first hearing, such operation would not be a violation of the interstate permit. On this point, it appears that the Congress intended to leave to the states the exclusive right to control and supervise shipments between points in the same state, even though, by reason of an interstate routing, the property was given an interstate character. The last proviso of Subdivision (a) of Section 306, Title 49 U.S. C.A., is as follows:

"And provided further, That this paragraph shall not be so construed as to require any such carrier lawfully engaged in operation solely within any State to obtain from the Commission a certificate

authorizing the transportation by such carrier of passengers or property in interstate or foreign commerce between places within such State if there be a board in such State having authority to grant or approve such certificates and if such carrier has obtained such certificate from such board. Such transportation shall, however, be otherwise subject to the jurisdiction of the Commission under this chapter."

Quite obviously the Congress undertook to avoid controversies and disputes such as the one involved in this case. The Interstate Commerce Commission would exercise jurisdiction over such commerce only in those cases where the state authorities had failed to do so.

The facts in this case are similar to Sprout v. South Bend, 277 U.S. 163, loc. cit. 168, 48 S.Ct. 502, loc. cit. 503, 72 L.Ed. 833, 62 A.L.R. 45, where the court said:

"The legal character of this suburban bus traffic was not affected by the device of requiring the payment of a fare fixed for some Michigan point or by Sprout's professing that he sought only passengers destined to that state. The actual facts govern. For this purpose, the destination intended by the passenger when he begins his journey and known to the carrier, determines the character of the commerce."

The testimony in support of the plaintiff tended to show that his depot or terminal in Kansas City, Kansas, was in close proximity to a number of large shippers. The inference intended to be drawn was that it was because of these shippers that the terminal was located in Kansas City, Kansas, and so close to the line between the states of Missouri and Kansas. It might be questioned, however, with a pickup and delivery zone with a radius of 25 miles, if the depot were so positioned as to accommodate heavy shippers whose factories and places of business were nearby.

Plaintiff's pickup zone at Kansas City, Kansas, was so laid out as to cover Kansas City, Missouri. By this device, the plaintiff could carry all the intrastate shipments between St. Louis and Kansas City and extend to the shippers an interstate rate far below the tariffs for purely intrastate hauls. The arrangement could not be justified upon a theory that it was a usual and regular route, as in the case of Missouri Pac. Railroad Co. v. Stroud, 267 U. S. 404, 45 S.Ct. 243, 69 L.Ed. 683, where the court upheld a shipment between points in Missouri as interstate commerce for the reason "that the usual and regular way of routing cars loaded with lumber at Oxly and consigned to St. Louis would be over the latter route through the state of Illinois and would be interstate commerce."

■ 3. It is a matter worthy of comment that the plaintiff accepted a license from the Public Service Commission which specifically forbade that he should haul property between points in Missouri. The Public Service Commission had promulgated a rule which prohibited the transportation of merchandise between points in Missouri under interstate permits. Such acceptance was a voluntary act on the part of the plaintiff. He had his choice, either to refrain from hauling merchandise and property between points in Missouri under his interstate permit, or to secure a certificate of convenience and necessity as an intrastate carrier. He was not under the compulsion mentioned in Union Pacific R. R. Co. v. Public Service Commission of Missouri, 248 U.S. 67, 39 S.Ct. 24, 63 L.Ed. 131, where the court said that the carrier company was compelled to take out a license or a certificate under the menace of a penalty which meant irreparable loss. The court decided that the complainant's act in accepting the terms of the certificate was not voluntary.

As said in Pullman Company v. Kansas, 216 U.S. 56, loc. cit. 66, 30 S.Ct. 232, loc. cit. 236, 54 L.Ed. 378, "by accepting the privilege, it has voluntarily consented to be bound by the condition."

This principle was upheld in Pierce Oil Corporation v. Phoenix Ref. Co., 259 U.S. 125, 42 S.Ct. 440, 66 L.Ed. 855.

Plaintiff would therefore have no right to challenge the validity of the said Rule No. 44.

■ 4. The defendant has filed a supplemental pleading wherein there is a prayer for an accounting of fees accumulated during the operations of the plaintiff since the granting of the original restraining order, December 31, 1936.

While the injunction granted by this court prohibited the defendant Public Service Commission from revoking and cancelling plaintiff's permit as an interstate carrier, such injunction in nowise relieved the plaintiff of the obligation to pay statutory or prescribed license fees.

No reason appears why such payments should not have been made. On the contrary, there is every reason why the plaintiff in a proceeding in equity should not meet all of the reasonable exactions of the state as condition precedent to the operations carried on by him.

Under Equity Rule 30, 28 U.S.C.A. following section 723, a defendant has a right to interpose a counter-claim "arising out of the transaction which is the subject-matter of the suit." It is doubtful whether these claims arose out of the transaction which is the subject matter of the suit, and, yet, because of the injunction, the plaintiff elected to discontinue the payment of fees.

No objection having been made to the filing of the counterclaim, this court will not interpose one under the circumstances of the case. The question having been presented, it should be considered by us.

In Piedmont & N. Ry. Co. v. Query, D.C., 56 F.2d 172, loc. cit. 175, the court said in discussing similar questions:

"And if either of these is a substantial question under the Constitution, we must proceed with the consideration of the other questions presented; for in such case the jurisdiction of the court extends to every question involved, whether of federal or state law, even though the court may not find it necessary to decide the federal question."

In Sovereign Camp, W. O. W., v. Murphy, D.C., 17 F.Supp. 650, loc. cit. 652, a case like this heard before three judges sitting in the Southern District of Iowa, the court said:

"But the duty imposed on the three-judge court * * * carries with it the duty on the part of the same three-judge court to try the whole case. The parties cannot be relegated to piecemeal trials of the several issues joined by them in their case."

The same principle was announced in Greene v. Louisville Railroad Co., 244 U.S. 499, loc. cit. 508, 37 S.Ct. 673, loc. cit. 677, 61 L.Ed. 1280, Ann.Cas. 1917E, 88, where the court said that:

"The jurisdiction of that court extended, and ours on appeal extends, to the determination of all questions involved in the case, including questions of state law, irrespective of the disposition that may be made of the Federal question, or whether it be found necessary to decide it at all."

In view of the above, unless the parties can agree after an inspection of the records upon the amount of the accumulated fees, it will be necessary to appoint a master to take an accounting and make his report to the court.

The injunction heretofore granted will be dissolved. The parties will be given thirty days from the filing of this opinion to agree upon the amount of the accumulated fees due under the counterclaim. If such agreement is not made within that time or within an extension for that purpose granted within that time, a decree will be entered dissolving the temporary injunction, refusing the permanent injunction and appointing a special master to determine the amount of fees payable under the counterclaim.

If such agreement as to fees is reached within the time above allowed, a decree will be entered dissolving the temporary injunction, refusing the permanent injunction, dismissing the bill upon its merits and awarding recovery upon the counterclaim for the amount so agreed upon.

Findings of Fact.

The court finds from the evidence in the case:

1. That the carriage of property from St. Louis, Missouri, to Kansas City, Kansas, and thence back into Kansas City, Missouri, for delivery, was not the normal, regular, or usual route for shipping merchandise or property between St. Louis and Kansas City, Missouri.

2. That the terminal or depot used by the plaintiff in Kansas City, Kansas, was approximately one-half mile from the Missouri State line by a used trafficway between Kansas City, Missouri, and Kansas City, Kansas.

3. That the route used by the plaintiff from St. Louis, Missouri, to his depot or terminal in Kansas City, Kansas, was through Kansas City, Missouri, and that the same trafficways were used in making deliveries of merchandise or property after same had been hauled in the first instance to the terminal in Kansas City, Kansas, and that such deliveries involved a retracing in part of the identical routes.

4. That, after reaching the terminal or depot in Kansas City, Kansas, plaintiff in many instances did not unload the merchandise, but used the same trailer employed in making the carriage from St. Louis, and hauled said property back over

594

the identical route used in going to his depot in Kansas City, Kansas, in making deliveries in Kansas City, Missouri, and North Kansas City, Missouri.

5. That a considerable portion of the operations carried on by plaintiff was in hauling property or merchandise between St. Louis, Missouri, and Kansas City, Missouri, and that much of such shipments was in carload lots, and that the method employed by the plaintiff was to haul such merchandise or property to his depot or terminal in Kansas City, Kansas, where a new driver, either with the same tractor and trailer, or with another tractor and the same trailer, would return the merchandise to Kansas City, Missouri.

6. That, in some instances, merchandise or property shipped between St. Louis and Kansas City was actually unloaded at the depot in Kansas City, Kansas, and then distributed to the consignees in Kansas City, Missouri. This, however, was a negligible percentage of the shipments between Missouri points.

7. That, prior to April 1, 1936, deliveries from the Kansas City, Kansas, depot to points in Missouri were made by an independent agency, but that subsequent to said date, such deliveries were made by plaintiff and are now being made by him.

8. That the rates for interstate carriage between St. Louis, Missouri, and Kansas City, Kansas, were much lower than intrastate transportation tariffs between St. Louis, Missouri, and Kansas City, Missouri, and that the expense of delivery from the Kansas City, Kansas depot was not as great as the difference in tariffs.

9. That the method of operation employed by the plaintiff was designed and intended to afford shippers the benefit of a lower rate, and that the transportation service rendered by him between St. Louis, Missouri, and Kansas City, Kansas, was not in good faith.

10. That the plaintiff voluntarily accepted an interstate permit with such terms and conditions as prohibited him from hauling merchandise between points in Missouri, and that permitted him only to carry property in interstate commerce between points in Missouri and points in other states and from points in other states to points in Missouri.

11. That the license fees and other charges made by the State of Missouri against the plaintiff for the use of the highways of the State of Missouri as an interstate motor carrier during the time the restraining order and temporary injunction of this court have been in force have accumulated, but have not been paid by the plaintiff although the injunctive relief sought by him did not relieve him, nor was it intended to relieve him, of the obligation to pay such fees and charges, nor did he seek to be relieved of such fees and charges.

The court makes the following conclusions of law:

I. That the act of the Public Service Commission in Missouri in cancelling and revoking plaintiff's permit as an interstate carrier was a valid and a constitutional exercise of its power.

II. That the plaintiff had violated the express terms of its interstate permit.

III. That the plaintiff has no right to challenge the constitutional validity of Rule Number 44 promulgated by the Public Service Commission.

IV. That the plaintiff is indebted to the State of Missouri for license fees and charges accumulated since the granting of a temporary restraining order in this case, and the state is entitled to judgment therefor.

STONE, Circuit Judge.

I concur in the findings of fact and conclusions of law stated by Judge REEVES. I concur in much of his opinion. I desire to add a thought mainly concerned with the construction to be given to a portion of Section 303(a) (10), 49 U.S.C.A. section 203 of the Motor Carrier Act, 1935.

Plaintiff seeks to enjoin revocation of a permit or license issued him by the proper Missouri authorities, to operate trucks over Missouri highways in interstate commerce. At the time this permit was granted, the grant was subject to Rule 44 of the Missouri authorities which forbade such licensed interstate carriers to "accept for transportation within this State any * * * property known to be destined to a point within the State of Missouri." Unless the limitation of this Rule was void as to plaintiff when the permit was issued or has become so since, it is clear that he has violated the permit and his permit or license is subject to revocation.

It seems to me this limitation was and is valid as applied to this plaintiff and as to his transactions here involved. That this regulation affects interstate commerce is clear. Whether it is invalid depends upon whether the regulation unduly affects—burdens—interstate commerce or unduly discriminates against such commerce. This rule of law is of years standing and is declared in numerous decisions of the Supreme Court. The difficulty is not with statement of the rule but with its application to specific situations.

Rule 44 is not per se discriminatory against interstate commerce. In some instances it might be, in others it might not be. Therefore, the problem as to discrimination depends upon the facts of the particular situation.

Rule 44 had a good purpose, namely, to prevent intrastate commerce being carried on under the guise of interstate commerce and thus fraudulently removing such from the regulation and control of the State. Truck and bus transportation is peculiarly liable to such abuse. Other transportation is not because it depends upon fixed physical equipment.

Another consideration is that the highways are built, maintained and belong to the State. Necessarily, the State has a large measure of control over the use of those highways.

It seems clear that this Rule would be valid, absent Congressional action, even though it "materially affected" interstate commerce. South Carolina State Highway Dept. v. Barnwell Bros., 58 S.Ct. 510, 82 L.Ed. —, decided February 14, 1938. Is the "Motor Carrier Act, 1935" such Congressional action as to render it invalid? I think not.

It is true that that Act (Section 303(a) (10), 49 U.S.C.A.) defines interstate commerce as including commerce "between places in the same State through another State," but Section 302(c), 49 U.S.C.A. declares that "nothing in this chapter shall be construed * * * to authorize a motor carrier to do an intrastate business on the highways of any State, or to interfere with the exclusive exercise by each State of the power of regulation of intrastate commerce by motor carriers on the highways thereof."

It seems to me that to give full force to these two provisions we should construe the word "through" as used in Section 303 not to include a situation where the carriage is merely over a state line and immediately back again for final delivery. "Through" is a word of common meaning. Primarily, it means "from one end or side to the other" (Webster's New International Dictionary). Although the word may have a more restricted meaning, if the text compels such construction, yet it is difficult to conceive a trip from St. Louis, Missouri, across the State of Missouri, through Kansas City, Missouri, and a half mile into Kansas City, Kansas, with an early return to Kansas City, Missouri, by the same route, as being described as "through" Kansas. If it can be, then much of the power of state regulation over what is in true essence intrastate commerce can be taken away merely through the subterfuge of darting across a state line and back again. I think this word "through" should be construed to cover only the situations where an ordinary and proper course of travel along a highway between the point of origin and the point of destination of a shipment would naturally result in a carriage across a state line and back again. If there is a choice of natural routes between the above points —one interstate and one intrastate—the carrier may use either and such use will determine the character of the shipment (interstate or intrastate) and the motive in making such choice is immaterial. But where the movement is merely to loop over a state line and back in an entirely unnecessary and abnormal movement, I think it should not be said that the shipment has passed "through" the other state within the meaning of the Motor Carrier Act. When we remember the relation of the state to the highways; the vast network of interlacing highways throughout the country; the number of cities at or near state lines; and the facility with which trucks and buses can cross state lines by deviation of only a few miles and thus divert what is really and truly an intrastate carriage into an interstate carriage, I think we should not construe the Act as including within interstate commerce every truck and bus that crosses a state line no matter how trivial or for what purpose.

Applying the above thoughts to the situation here we find a considerable business being done by this trucking company which is essentially an intrastate business. The feature relied upon to make it inter-

state business is that it goes about a half mile beyond the Missouri-Kansas line and then is brought promptly back into Missouri—by the same or practically the same route used when it crossed over the state line. This is done under the guise of a "delivery service". That service extending for at least twenty-four miles into Missouri and including within that radius all of Kansas City, Missouri, North Kansas City and some miles into Clay and Jackson Counties, Missouri—in short, the entire commercial and industrial territory of Kansas City, Missouri, and vicinity.

If this can be done, it seems to me it must be by ignoring the usual meaning of the word "through" and in violation of the statutory injunction that "nothing in this chapter shall be construed * * * to authorize a motor carrier to do an intrastate business on the highways of any state, or to interfere with the exclusive exercise by each state of the power of regulation of intrastate commerce by motor carriers on the highways thereof."

OTIS, District Judge (dissenting).

I regret exceedingly my inability to concur with my learned colleagues in the disposition of this case. I can not concur even in the Findings of Fact. Quite probably I am wrong, quite probably my colleagues are entirely right. I would not set out my views at all except that I do not wish hereafter to be understood as having concurred in ideas with which I cannot agree. I shall sign the decree, of course, since, when determined upon by the majority of the Court, it is the decree of the Court, and since I understand it is the proper practice for a dissenting judge to join in the decree.

1. After the hearing upon plaintiff's application for a temporary injunction this court handed down its unanimous per curiam opinion and made Findings of Fact. The evidence received at that hearing substantially was the same as that given on final hearing. Then we unanimously were of the opinion that an injunction should issue. Since the Findings of Fact which we made then best describe (except in one trifling particular which will be indicated hereafter) the true character. of plaintiff's business and the manner and method of his operation, I repeat them in haec verba here.

"1. The plaintiff transports freight by automobile trucks as a common carrier between freight terminals or depots located in St. Louis, Missouri, Kansas City, Kansas, Wichita, Kansas, Des Moines, Iowa, and Burlington, Iowa. By far the largest part of its business consists of the transportation of goods from points in one state to points in other states. A small percentage of its business (approximately 5%) consists in the transportation of goods from points in Missouri to other points in Missouri, chiefly from Kansas City, Missouri, to St. Louis, Missouri, and from St. Louis, Missouri, to Kansas City, Missouri.

"2. At St. Louis, Missouri (and so also at each of the cities at which plaintiff has a terminal or depot) the plaintiff renders to its patrons a so-called 'pick-up' service. This service it renders to all its patrons living within a circle having a radius of twenty-five miles, the center of which is at the plaintiff's terminal or depot. The plaintiff picks up at the place of business of a patron the consignment he desires to have transported, carries that consignment to the terminal or depot, unloads it on a dock there situated, thence it is loaded on a line truck and by that line truck transported to some other of the plaintiff's terminals or depots. It is unloaded from the line truck at the terminal or depot of its destination. At that terminal or depot, as at each other of plaintiff's terminals or depots, a 'delivery service' is rendered by plaintiff. Plaintiff causes the shipment to be loaded on to a delivery truck and by that truck carried to the place of business of the consignee. This 'delivery service', like the 'pick-up' service, is rendered to patrons of the plaintiff living within a circle having a twenty-five mile radius, the center of which is the terminal or depot of the plaintiff. Since the St. Louis 'pick-up' service area of the plaintiff, the center of which is the St. Louis, Missouri, terminal of the plaintiff, necessarily includes a part of Missouri, and since the Kansas City, Kansas 'delivery' area, the center of which is at the plaintiff's terminal in Kansas City, Kansas, necessarily also includes a part of Missouri, some consignments will be from consignors whose places of business are in Missouri to consignees whose places of business also are in Missouri. All consignments, however, from the St. Louis, Missouri 'pick-up' area to the Kansas City, Kansas, 'delivery' area are transported in due and regular course of plaintiff's busi-

ness (and necessarily are so transported) from plaintiff's terminal or depot in St. Louis, Missouri, to plaintiff's terminal or depot in Kansas City, Kansas. So also as to consignments from the Kansas City, Kansas 'pick-up' area to the St. Louis, Missouri 'delivery' area.

"3. Conforming with laws enacted by Congress plaintiff has filed with the Interstate Commerce Commission schedules of its rates for the transportation of freight and full information touching the points between which it carries freight, and in connection with each of these points a full statement as to the 'pick-up' and 'delivery' service there rendered and the areas within which that service is rendered, all of which it is required to do by laws enacted by Congress. The plaintiff carries no freight except in accordance with its freight rates on file with the Interstate Commerce Commission. Plaintiff carries no freight between any points in Missouri save and except that which in the usual and regular course of its business it carries from a terminal in one state to a terminal in another state."

The evidence received at the final hearing would justify a finding that it was 10% rather than 5% of plaintiff's business which originated in Missouri and was destined for consignees in Missouri. Such a trifling difference, however, justifies no difference in the conclusions reached. Beyond any possibility of controversy, in my judgment, every part of plaintiff's business is interstate commerce. While Missouri, in the absence of Congressional occupancy of a particular field may so legislate as to affect interstate commerce (as by regulating the size of trucks, prescribing particular routes to be traversed by them, regulating the speed at which they may travel) Missouri has no power whatever, directly or indirectly, by refusal to grant a permit or by conditioning a permit granted, to prevent and prohibit interstate commerce in a single pound of freight. But that is what the Public Service Commission is endeavoring to do here. We enjoined it temporarily. We should enjoin it permanently.

In none of the formal conclusions of law announced by the majority is it ruled that any part of the carriage of freight by plaintiff is not interstate commerce. The mere fact that freight is put on board a truck in Missouri and is delivered in Missouri certainly does not make the trans-

portation of that freight the less interstate commerce, if a state line is crossed in its transportation. Missouri Pac. R. Co. v. Stroud, 267 U.S. 404, 45 S.Ct. 243, 69 L. Ed. 683. It is suggested, however, in the opinions of the majority, that occasionally the plaintiff would carry a whole truckload of freight from a consignor in St. Louis, Missouri, to a consignee in Kansas City, Missouri, that that truckload would be carried directly past its Missouri destination over a given route to plaintiff's Kansas City, Kansas, terminal, that the truck then would be turned around, perhaps with a change of tractor and a change of driver, driven back over the same given route to the consignee's place of business in Missouri, which it had passed an hour or two before. My colleagues think that that would be mere subterfuge and evasion. If that were all, I should think so too. But I do not think it would not involve interstate commerce. Such a movement would in reality be two movements, not one continuous movement, but two movements, one intra-state, the other interstate. That one of these two movements which is wholly intra-state the state may prohibit. That movement does not become interstate because an entirely independent and useless interstate movement is superimposed upon it.

But the suppositious case is not this case. I do not think the evidence in this case indicates that there ever was a single such instance in the transportation carried on by plaintiff. The evidence does indicate that occasionally, very rarely, plaintiff will carry an entire truckload of freight consigned in St. Louis, Missouri, to a consignee in Kansas City, Missouri. That truck will travel over plaintiff's usual and normal route to the terminal in Kansas City, Kansas. At the terminal that truck is turned over by the driver and its load is checked but it is not unloaded and the load put in another truck, which would be a foolish and wasteful thing to do. A new tractor is attached to the same truck and with a different driver the truck is taken with its load to the consignee in Missouri. There is no evidence that that consignee ever would be on the identical road over which the truck previously had passed. In any event, that truckload must be dealt with at the terminal. There the freight must be checked and the driver relieved from further responsibility. It is not usual for freight to be thrown off

598

a train between stations although the consignee lives between them.

As I understand the views of my colleagues, they believe there is a distinction between (a) carrying some freight from a point in Missouri to a point in Missouri as a part of a truckload (which, of course, must be separated at the terminal from other freight in that truckload) and (b) carrying other freight from a point in Missouri to a point in Missouri, which, because it fills a truck, requires no separation at the terminal from other freight and requires no transfer from one truck to another. Carriage of character (a), my colleagues think, is interstate commerce, while carriage of character (b) is intrastate. I cannot agree that the slight and altogether reasonable differences in these two methods of handling freight possibly can affect the character of the commerce involved in either. It is entirely possible that I have interpreted incorrectly the views of my colleagues.

In the separate concurring opinion of Judge STONE special emphasis is placed upon Rule 44 prescribed by the Public Service Commission. Since that rule is not set out in its precise terms in either of the opinions of my colleagues I set it out. It is as follows:

"No driver or operator operating under an interstate permit shall accept for transportation within this state any person or property known to be destined to a point within the State of Missouri. If such interstate carrier accepts within Missouri a passenger whose destination is beyond the limits of the State of Missouri, such passenger shall not be permitted to terminate his trip within the State of Missouri; and if such interstate carrier accepts within Missouri property destined to a point beyond the limits of the State of Missouri such property shall not be terminated within the State of Missouri."

It seems to me this rule cannot reasonably be interpreted to apply to plaintiff's operation. It will not be so interpreted if the whole rule is read together. The second sentence of the rule makes clear what is meant by the first sentence of the rule.

It is provided in the first sentence of the rule that "No driver or operator operating under an interstate permit shall accept for transportation within this state any person or property known to be destined to a point within the State of Mis-

souri." But it is clear from the second sentence that what is aimed at in the first sentence is a transportation of persons or property which is wholly within the state on a contract to transport beyond the state. That, at least, is a reasonable interpretation and it is the only interpretation consistent with constitutional principles.

Plaintiff's operation which the Public Service Commission attacks either is interstate commerce or it is not interstate commerce. If it is not interstate commerce of course the state can prevent it for plaintiff has authority to engage only in interstate commerce. The only purpose of any reference to Rule 44 in this case is on the theory that plaintiff's operation is interstate commerce of such a character as violates Rule 44 and that Rule 44, if construed to apply to that operation, is a valid rule. I have said that the rule should not be interpreted to apply to plaintiff's operation. I now say that if so interpreted it has no validity whatever.

Whence did the Public Service Commission derive any authority to adopt Rule 44? Undoubtedly from Section 5267(b) R.S.Mo.1929, as amended, Mo.St.Ann. § 5267(b), p. 6682, where it is set out that—"The Public Service Commission shall have power and authority by general order or otherwise to prescribe rules and regulations governing all motor carriers." But into that statute must be read the implied provision that no such rule or regulation may violate the federal Constitution. Given a rule or regulation, no such construction should be placed upon it as will make it violative of the federal Constitution.

Judge STONE believes that even although Rule 44 is interpreted to apply to plaintiff's operation (and the Public Service Commission has so interpreted it), nevertheless it may be valid, that it only "affects" interstate commerce. It is at that point that I find myself unable to concur with my learned colleague. As now interpreted the rule does not "affect" interstate commerce, it prohibits it. Note the very language of the rule: "No driver or operator operating under an interstate permit shall accept for transportation within this state any person or property known to be destined to a point within the State of Missouri." I may be utterly in error, but certainly it is my view that no state can prohibit, by any method, interstate commerce in any subject of legiti-

mate commerce. No state can do that whether or not Congress has legislated in the field.

Even in the field of regulations which do not prohibit but only affect interstate commerce the power of the state vanishes when once Congress has assumed jurisdiction and has legislated. Exactly that is the situation here. Congress has legislated in the field of transportation in interstate commerce by motor vehicles. Motor Carrier Act 1935. Section 303(a) (10), 49 U.S.C.A., section 203, of that Act defines interstate commerce so as to include commerce "between places in the same State through another State." My learned colleague believes that the word "through" in the Congressional definition (which was but the restatement of several decisions of the Supreme Court) does not describe "a situation where the carriage is merely over a state line and immediately back again for final delivery." The definition from Webster's Dictionary is set out, indicating that the primary meaning of "through" is, "from one end or side to another." But if that primary meaning is the meaning here, the word certainly was misused.

I think the meaning is that in which the word "through" was used by Mr. Justice Holmes in Western Union Telegraph Co. v. Speight, 254 U.S. 17, 41 S.Ct. 11, 65 L.Ed. 104. In that case a telegraphic message originated in North Carolina and was for transmission to a point in the same state. It was so routed as to pass through a part of Virginia. It was found as a fact that that routing was "for the purpose of fraudulently evading liability under the law of North Carolina." Mr. Justice Holmes said: "The transmission of a message through two states is interstate commerce as a matter of fact. * * * The fact must be tested by the actual transaction." Again he said: "The court below * * * held that when as here the termini were in the same State the business was intra-state unless it was necessary to cross the territory of another State in order to reach the final point. This * * * is not the law."

It seems to me that the word "through", as used by Congress, cannot be limited in its meaning to a more or less extensive carriage through another state (who will determine the minimum carriage which will amount to carriage "through" another state?) Certainly it should not depend upon the purpose in the carrier's mind.

As in Western-Union Telegraph Co. v. Speight and in Missouri P. R. Co. v. Stroud, supra, it should depend upon the fact, upon whether a state line is crossed. If the purpose is evasion of state law, of what significance is that? As the zone of state law is passed the zone of federal law is entered. There is no "no man's land" between these zones where lawlessness obtains.

My colleague forcibly says that there is danger "that what is in true essence intra-state commerce can be taken away merely through the subterfuge of darting across a state line and back again." But the evidence in this case does not disclose a mere darting across a state line and back again. It does not record a single instance of that kind. And if it did, it would not be in its "essence" intra-state commerce, if the movement is a single movement. How can any movement be wholly intra (within a) state which crosses a state line?

2. Defendants have asked leave to file a counterclaim. The plaintiff, it is alleged, owes the state fees for the use of the highways which fees it has not paid. It is sought to recover them by this counterclaim. There are two reasons why I think the counterclaim should not be permitted to be filed, although I have little doubt that the fees sought are owing.

Equity Rule 30, 28 U.S.C.A. following section 723, authorizes (1) a "counterclaim arising out of the transaction which is the subject-matter of the suit." Also it authorizes (2) a "counterclaim against the plaintiff which might be the subject of an independent suit in equity against him." Two classes of counterclaims are thus provided for. Moore v. Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L. Ed. 750, 45 A.L.R. 1370. But obviously the counterclaim sought to be asserted here does not fall in class (2); it could not be made the subject of an independent suit in equity. (It might be made the subject of a suit at law.) Does it arise out of the transaction which is the subject matter of the suit?

It is said in the opinion of the majority that it is doubtful if this counterclaim "arose out of the transaction which is the subject matter of the suit." I should go further in the same direction and say that it is certain the counterclaim does not arise out of the same transaction. What was "the transaction" which is the subject matter of this suit?

The Public Service Commission revoked or threatened to revoke the plaintiff's interstate permit and threatened then to prevent plaintiff operating without an interstate permit. The suit arises out of the withdrawal or threatened withdrawal of the permit and consequences incident to that withdrawal. The right to fees arises out of the use of the state's highways by plaintiff. Certainly the (a) withdrawal of the right to use the highways and (b) the use of the highways are not the same thing, not the same transaction. They are scarcely comparable but, if comparable, they are not comparable as resembling one another but as opposites.

It is true that the plaintiff is operating under our temporary injunction. Because he is operating he owes fees. It may be said then that the counterclaim arises because of the injunction and that the injunction arose from the threatened withdrawal of the interstate permit. That, however, is a connection quite remote between counterclaim and "transaction" and not the immediate connection which the rule requires.

My second reason for believing this counter claim should not be entertained is this. If plaintiff owes fees for the use of the highways of the state he owes them to the state or to the state treasurer for the state. Sec. 5272, R.S.Mo.1929, Mo.St. Ann. § 5272, p. 6689. He does not owe them to the Public Service Commission whose members are the defendants in this case. Nor have I found any statute authorizing the Commission to sue for such fees as the agent of the state.

3. In my view a permanent injunction should issue and leave to file the counterclaim should be denied.